IN THE UNITED STATES COURT OF FEDERAL CLAIMS

21-1621
(SENIOR JUDGE HORN)

THE NATIONAL APARTMENT ASSOCIATION, DARBY DEVELOPMENT COMPANY, INC.,
GWR MANAGEMENT, LLC, MCLEAN INVESTMENTS, LLC, SHANDER INTERNATIONAL,
LLC, 104WWB, LLC, MICHAEL RAK, MOHAMMAD ZAMANIAN, REGINA TILLMAN,
RICHARD AND JOANNE PANEK, INTERCOASTAL YACHT CLUB, LLC, R. JAMES
PROPERTIES, INC., CAPITAL CITY INTERIOR LLC, VERITAS EQUITY MANAGEMENT,
L.L.C., AZURE PARK APARTMENTS, LLC, BAY BRIDGE PROPERTIES LLC, BELLA
ESTATES NEVADA, LLC., CASAS ADOBES PARTNERS V L.L.C., DECATUR POINT LLC,
ENCANTADA APARTMENTS, LLC, GRAND CHANNEL, LLC, HESPERIAN FALLS
PARTNERS LLC, LAKE CHARLOTTE, LLC, LAS VEGAS CAMERON APTS LLC, LOGAN
VENTURES OF CALIFORNIA PROPERTIES LLC, PARADISE SQUARE, LLC., REDWOOD
GARDEN PROPERTIES, LLC, RIDGE FALLS APARTMENTS, LLC, RIVERBEND VILLAGE
PARTNERS LLC, SUNSET TERRACE PARTNERS LLC, TSV CROSSROADS AT ROCHELLE
LLC, VILLA MONTEREY PROPERTIES, LLC, VILLA EAST PROPERTIES, LLC, ORION
PROPERTIES OF WEST PALM BEACH, LLC, BELHAVEN RESIDENTIAL, LLC, GWR BH
HOLDINGS, LTD., GWR EQUITIES LLC, GWR TEXAS SE PARTNERS, LTD., GWR TRAILS
PARTNERS, LTD., GG ICON LLC,

Plaintiffs,

v.

UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

L. MISHA PREHEIM
Assistant Director

CHRISTOPHER J. CARNEY
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7597
chris.carney@usdoj.gov

NATHANAEL B. YALE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

MARK PACELLA
MATTHEW P. RAND
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice

November 12, 2021                    *Attorneys for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

QUESTIONS PRESENTED...............................................................................................3

STATEMENT OF THE CASE............................................................................................3

    I.       Public Health Laws Regarding Communicable Diseases............................................3

    II.      The COVID-19 Pandemic ...........................................................................................4

    III.    CDC's Eviction Moratorium......................................................................................5

    IV.    Extensions Of The Eviction Moratorium And Emergency Rental
            Assistance ....................................................................................................................8

    V.      Challenges To The Legality Of The Eviction Moratorium .......................................9

    VI.    Amended Complaint Allegations................................................................................10

ARGUMENT .....................................................................................................................11

    I.       Standard Of Review ...................................................................................................11

    II.      The Supreme Court's Ruling And District Court Judgment Regarding
            The Lack Of Authority For The Eviction Moratorium Preclude Plaintiffs'
            Takings Claims ..........................................................................................................12

    III.    Assuming The Moratorium Was Authorized, Plaintiffs Lack A Cognizable
            Property Interest Because The CDC's Longstanding Statutory Authority
            Inhered In The Title To Plaintiffs' Property ..............................................................19

    IV.    The Police Power Doctrine Precludes The Finding Of A Cognizable Taking ..........22

    V.      Even If Assessed Under The Takings Clause, Plaintiffs Fail To State A
            Valid Claim For Relief..............................................................................................24

           A.  The CDC Eviction Moratorium Was Not A *Per Se* Physical Taking..................24

           B.  Plaintiffs Fail To Meet The Requirements of *Penn Central* For Stating A
               Regulatory Takings Claim .....................................................................................30

               1.  Plaintiffs Have Failed To Plead Economic Impact.........................................30

2.   Plaintiffs Have Failed To Plead That The Eviction Moratorium Interfered With Their Reasonable Investment Backed Expectations ............34

3.   The Character Of The Government Action Weights Heavily Against Finding A Taking .................................................................................36

C.  Under Supreme Court And Federal Circuit Precedent The Mere Frustration Of A Contractual Expectancy Is Insufficient To Establish A Taking ...........................................................................................................37

VI.    Plaintiffs Fail To State Claims For An Illegal Exaction ............................................38

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*A-1 Amusement Co. v. United States*,
    48 Fed. Cl. 63 (2000) ................................................................ 16-18

*A-1 Cigarette Vending, Inc. v. United States*,
    49 Fed. Cl. 345 (2001) ........................................................ 13, 16-18

*A&D Auto Sales, Inc. v. United States*,
    748 F.3d 1142 (Fed. Cir. 2014) .............................................. 20, 31

*Acadia Tech., Inc. v. United States*,
    458 F.3d 1327 (Fed. Cir. 2006) ..................................................... 23

*Aerolineas Argentinas v. United States*,
    77 F.3d 1564 (Fed. Cir. 1996) ................................................... 38-39

*Air Pegasus of D.C., Inc. v. United States*,
    424 F.3d 1206 (Fed. Cir. 2005) ..................................................... 21

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    21-5093, 2021 WL 4057718 (D.C. Cir. Sept. 3, 2021) ................... 10, 18

*Ala. Ass'n of Realtors v. Dep't of Health &Hum. Servs.*,
    141 S. Ct. 2485 (2021) ............................................................. *passim*

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    --F. Supp. 3d--, 2021 WL 1779282 (D.D.C. May 5, 2021) ...................... 9

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    --F. Supp. 3d--, 2021 WL 1946376 (D.D.C. May 14, 2021) ................... 9

*Am. Bankers Ass'n v. United States*,
    932 F.3d 1375 (Fed. Cir. 2019) ..................................................... 19

*Am. Pelagic Fishing Co. v. United States*,
    379 F.3d 1363 (Fed. Cir. 2004) ..................................................... 21

*AmeriSource Corp. v. United States*,
    525 F.3d 1149 (Fed. Cir. 2008) ..................................................... 23

*Andrus v. Allard*,
    444 U.S. 51 (1979) ...................................................................... 31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................... 12, 39

*Auracle Homes, LLC v. Lamont*,
    478 F. Supp. 3d 199 (D. Conn. 2020) ...........................................................28, 35-36

*B & G Enterprises, Ltd. v. United States*,
    48 Fed. Cl. 866 (2001) ............................................................................................ 18

*Bair v. United States*,
    515 F.3d 1323 (Fed. Cir. 2008).......................................................................... *passim*

*Baptiste v. Kennealy*,
    490 F. Supp. 3d 353 (D. Mass. 2020) ................................................................. 28, 35

*Bd. Mach., Inc. v. United States*,
    49 Fed. Cl. 325 (2001) ........................................................................................ 16-17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................ 12, 39

*Blanchette v. Connecticut Gen. Ins. Corps.*,
    419 U.S. 102 (1974)................................................................................................. 15

*Block v. Hirsh*,
    256 U.S. 135 (1921)............................................................................................. 22-25

*Bowles v. Willingham*,
    321 U.S. 503 (1944)................................................................................................. 32

*Brown v. Legal Found. of Wash.*,
    538 U.S. 216 (2003)............................................................................................ 25, 27

*Brubaker Amusement Co. v. United States*,
    No. 98-511C, 2001 U.S. Claims LEXIS 89 (Jan. 12, 2001)................................. 16-18

*Brubaker Amusement Co. v. United States*,
    304 F.3d 1349 (Fed. Cir. 2002)............................................................................... 18

*Cal. Hous. Sec., Inc. v. United States*,
    959 F. 2d 955 (Fed. Cir. 1992)............................................................................. 21-22

*CCA Assocs. v. United States*,
    667 F.3d 1239 (Fed. Cir. 2011)............................................................................... 33

iv

*Cedar Point Nursery v. Hassid,*
  141 S. Ct. 2063 (2021) ............................................................................................ *passim*

*Cienega Gardens v. United States,*
  503 F.3d 1266 (Fed. Cir. 2007) ........................................................................... 32-34

*Clapp v. United States,*
  127 Ct. Cl. 505 (1954) .................................................................................................. 38

*Coast Indian Cmty. v. United States,*
  550 F.2d 639 (Ct. Cl. 1977) ........................................................................................ 16

*Columbus Regional Hosp. v. United States,*
  990 F.3d 1330 (Fed. Cir. 2021) ................................................................................. 38

*Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,*
  508 U.S. 602 (1993) ...................................................................................................... 33

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ................................................................................................. 30-31

*Dureiko v. United States,*
  209 F.3d 1345 (Fed. Cir. 2000) ................................................................................. 15

*E. Enters. v. Apfel,*
  524 U.S. 498 (1998) ...................................................................................................... 25

*Eastport S.S. Corp. v. United States,*
  372 F.2d 1002 (Ct. Cl. 1967) ...................................................................................... 38

*Elmsford Apartment Assocs., LLC v. Cuomo,*
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) ................................................................ 28, 35

*FCC v. Fla. Power Corp.,*
  480 U.S. 245 (1987) ...................................................................................................... 24

*Fed. Home Loan Mortg. Corp. v. N.Y. York State Div. of Hous. & Cmty. Renewal,*
  83 F.3d 45 (2d Cir. 1996) ............................................................................................ 32

*Fla. Rock Indus., Inc. v. United States,*
  18 F.3d 1560 (Fed. Cir. 1994) ................................................................................... 23

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................................................... 17

v

*Gadsden Indus. Park, LLC v. United States*,
  956 F.3d 1362 (Fed. Cir. 2020) ............................................................... 19

*Great Falls Mfg. Co. v. Garland*,
  124 U.S. 581 (1888) ................................................................................. 14

*Heights Apartments, LLC v. Walz*,
  510 F. Supp. 3d 789 (D. Minn. 2020) ........................................... 28-29, 35

*Hendler v. United States*,
  175 F.3d 1374 (Fed. Cir. 1999) ............................................................... 31

*Henke v. United States*,
  60 F.3d 795 (Fed. Cir. 1995) .............................................................. 10-11

*Higo v. United States*,
  194 U.S. 315 (1904) ................................................................................. 15

*Holley v. United States*,
  124 F.3d 1462 (Fed. Cir. 1997) ............................................................... 11

*Hooe v. United States*,
  218 U.S. 322 (1910) .......................................................................... *passim*

*Huntleigh USA Corp. v. United States*,
  525 F.3d 1370 (Fed. Cir. 2008) ............................................................... 38

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
  781 F.2d 879 (Fed. Cir. 1985) ................................................................. 11

*Jevons v. Inslee*,
  1:20-CV-3182-SAB, 2021 WL 4443084 (E.D. Wash. Sept. 21, 2021) .............................. 28-30

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979) ................................................................................. 27

*Kam-Almaz v. United States*,
  682 F.3d 1364 (Fed. Cir. 2012) ......................................................... 11, 23

*Lion Raisins, Inc. v. United States*,
  416 F.3d 1356 (Fed. Cir. 2005) ............................................................... 15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ............................................................................ 26-27

*Love Terminal Partners, L.P. v. United States,*
 889 F.3d 1331 (Fed. Cir. 2018) ................................................................. 34

*Lucas v. S.C. Coastal Council,*
 505 U.S. 1003 (1992) .......................................................................... 20, 23

*M & J Coal Co. v. United States,*
 47 F.3d 1148 (Fed. Cir. 1995) ................................................................. 21

*Maritrans Inc. v. United States,*
 342 F.3d 1344 (Fed. Cir. 2003) ............................................................36-37

*McCutchen v. United States,*
 14 F.4th 1355 (Fed. Cir. 2021) .......................................................... 21, 23

*Miller v. Schoene,*
 276 U.S. 272 (1928) ................................................................................ 23

*Mitchell Arms, Inc. v. United States,*
 7 F.3d 212 (Fed. Cir. 1993) ..................................................................... 21

*NBH Land Co. v. United States,*
 576 F.2d 317 (Ct. Cl. 1978) .............................................................. 13, 16

*Norman v. United States,*
 429 F.3d 1081 (Fed. Cir. 2005) ............................................................... 34

*Omnia Commerical Co. v. United States,*
 261 U.S. 502 (1923) ............................................................................37-38

*Pa. Coal Co. v. Mahon,*
 260 U.S. 393 (1922) .......................................................................... 31, 37

*Palmyra Pac. Seafoods, L.L.C. v. United States,*
 561 F.3d 1361 (Fed. Cir. 2009) ............................................................... 37

*Penn Cent. Transp. v. City of N.Y.,*
 438 U.S. 104 (1978) ......................................................................... *passim*

*Pennell v. City of San Jose,*
 485 U.S. 1 (1988) .................................................................................... 27

*Phillips v. Wash. Legal Found.,*
 524 U.S. 156 (1998) ................................................................................ 20

*Piszel v. United States,*
   121 Fed. Cl. 793 (2015) ............................................................................ 38

*Piszel v. United States,*
   833 F.3d 1366 (2016) .......................................................................... 38, 40

*Reynolds v. Army & Air Force Exch. Serv.,*
   846 F.2d 746 (Fed. Cir. 1988) ................................................................... 11

*Rose Acre Farms, Inc. v. United States,*
   559 F.3d 1260 (Fed. Cir. 2009) ................................................................. 37

*Ruckelshaus v. Monsanto,*
   467 U.S. 986 (1984) .................................................................................. 34

*S. Cal. Fin. Corp. v. United States,*
   634 F.2d 521 (Ct. Cl. 1980) ......................................................... 13, 16, 18

*Short v. United States,*
   50 F.3d 994 (Fed. Cir. 1995) ................................................................ 15-16

*Straw v. United States,*
   No. 2021-1600, 2021 WL 3440773 (Fed. Cir. Aug. 6, 2021) ............. 13, 15

*Sun Oil Co. v. United States,*
   572 F.2d 786 (Ct. Cl. 1978) ...................................................................... 16

*Tabb Lakes, Ltd. v. United States,*
   10 F.3d 796 (Fed. Cir. 1993) ..................................................................... 18

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
   535 U.S. 302 (2002) ......................................................................25, 31-32

*Trusted Integration, Inc. v. United States,*
   659 F.3d 1159 (Fed. Cir. 2011) ................................................................. 11

*United States v. Cent. Eureka Mining Co.,*
   357 U.S. 155 (1958) .................................................................................. 30

*United States v. Goltra,*
   312 U.S. 203 (1941) .................................................................................. 13

*United States v. N. Am. Transp. & Trading Co.,*
   253 U.S. 330 (1920) .............................................................................13-15

*Westfed Holdings, Inc. v. United States*,
   52 Fed. Cl. 135 (2002) ............................................................................ 40

*Wyatt v. United States*,
   271 F.3d 1090 (Fed. Cir. 2001)................................................................ 19

*Yee v. City of Escondido, Cal.*,
   503 U.S. 519 (1992)......................................................................... *passim*

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)................................................................................ 15


### Statutes & Session Laws

Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) ........................................ 22

42 U.S.C. § 264.......................................................................................... 4-5

42 U.S.C. §§ 3601-19 ................................................................................. 35

Public Service Health Act, Pub. L. No. 78-410, 58 Stat. 682, 807 (1944) ..................... 3-4, 22, 34

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020)............ 8, 34

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) .......................... 8, 34


### Federal Regulations

42 C.F.R. § 70.2 ..................................................................................... 4-5, 22


### Other Authorities

Declaring a National Emergency Concerning the Novel Coronavirus
   Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337
   (Mar. 13, 2020) ................................................................................... 4-5

Temporary Halt in Residential Evictions To Prevent The Further Spread of COVID-19,
   85 Fed. Reg. 55,292 (Sept. 4, 2020) ........................................... *passim*

Fighting the Spread of COVID-19 by Providing Assistance to Renters and
   Homeowners, Exec. Order No. 13,945, 85 Fed. Reg. 49,935 (Aug. 8, 2020)............................ 5

86 Fed. Reg. 8,020 (Feb. 3, 2021) .......................................................................... 8

86 Fed. Reg. 16,731 (Mar. 31, 2021) ...................................................................... 8

86 Fed. Reg. 34,010 (June 28, 2021) ....................................................................... 8

86 Fed. Reg. 43,244 (Aug. 6, 2021) ........................................................................ 8

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss plaintiffs' complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted.

<u>INTRODUCTION</u>

In response to one of the worst public health crises in the country's history, the Centers for Disease Control and Prevention (CDC) issued a temporary moratorium on residential evictions for nonpayment of rent (the Eviction Moratorium). The CDC concluded that the COVID-19 pandemic had created a risk of widespread evictions; that these evictions would increase the risk of spreading COVID-19 by forcing evicted renters to move to shared-living or congregate settings or to become homeless; and that the Eviction Moratorium was necessary to prevent the interstate spread of the disease.

Plaintiffs—a group of residential property owners in several states—brought this action seeking to recover just compensation for the alleged taking of their purported right to exclude non-paying tenants from their properties. According to plaintiffs, the CDC's actions in protecting vulnerable tenants from forcible eviction (though not relieving them of their obligation to pay rent) while a deadly disease spread across the country amounted to a physical occupation of their property. Alternatively, plaintiffs claim that the CDC's actions amounted to an illegal exaction.

The Court should dismiss plaintiffs' takings claims for several independent reasons. First, it is settled law that a plaintiff cannot bring a claim under the Just Compensation Clause of the Fifth Amendment founded upon unauthorized agency action. Here, the Supreme Court concluded it was virtually certain that the CDC lacked statutory authority to issue the Eviction

Moratorium, and a Federal district court issued a final judgment vacating the Eviction Moratorium on the ground that it was unauthorized.   Second, even if the Court were to treat the Eviction Moratorium as authorized by pre-existing Federal law, such law would inhere in plaintiffs' property rights, thereby precluding a takings claim.  Moreover, plaintiffs have no property interest in being free from the Government's lawful exercise of its regulatory authority. Third, the sole takings allegation in the complaint is that the Eviction Moratorium amounted to a Government-authorized physical occupation of plaintiffs' properties.  However, the Supreme Court has long held that when a landlord voluntarily invites tenants on to its property, laws that regulate that relationship do not amount to a physical taking.  Fourth, even if the Court were to assess plaintiffs' takings claims under the framework for analyzing regulatory takings, plaintiffs do not adequately plead economic impact or an interference with reasonable investment-backed expectations, and the character of the Government action was to protect the public health—not to physically invade plaintiffs' properties.  And fifth, plaintiffs allege that the Eviction Moratorium—though it did not relieve tenants from the obligation to pay rent—interfered with their ability to collect contractually due rent.  Yet, it is settled that interference with a plaintiff's contract does not itself give rise to a takings claim.

Finally, plaintiffs have failed to state cognizable illegal-exaction claims.  An illegal-exaction claim can only be maintained when, contrary to law, the Government forces a plaintiff to pay money over to the Government or a third party.  However, there are no allegations in the complaint that plaintiffs have paid any money to the Government or to a third party at the Government's insistence.  Thus, the illegal-exaction claims must be dismissed as well.

QUESTIONS PRESENTED

1.     Whether plaintiffs fail to state takings claims when the Supreme Court concluded that it is "virtually certain" that the Eviction Moratorium was not authorized by Congress, and where a Federal district court vacated the Eviction Moratorium as unauthorized.

2.     Alternatively, if plaintiffs contend that pre-existing Federal law authorized the CDC to enact the Eviction Moratorium, whether they fail to state takings claims because such pre-existing law would have inhered in their property rights.

3.     Whether plaintiffs fail to state physical takings claims where the Government neither occupied nor authorized others to occupy their property, but instead plaintiffs voluntarily entered into agreements allowing tenants on to their property.

4.     Whether plaintiffs fail to state regulatory takings claims when they do not adequately plead economic impact and interference with reasonable investment-backed expectations, and where the Government's actions were taken to mitigate a pandemic that has killed over 750,000 Americans.

5.     Whether plaintiffs are barred from asserting a takings claim based upon alleged interference with their contractual expectations under their lease agreements.

6.     Whether plaintiffs fail to state a claim for an illegal exaction when they neither allege that they have paid money to the Government nor that the Government has forced them to pay money to third-parties.

STATEMENT OF THE CASE

I.     Public Health Laws Regarding Communicable Diseases

In 1944, Congress enacted section 361(a) of the Public Service Health Act, Pub. L. No. 78-410, 58 Stat. 682, 703 (1944) (PSHA), as part of an effort to consolidate and clarify public

3

health laws.  The statute, subsequently codified at 42 U.S.C. § 264, authorizes the Secretary of the Department of Health and Human Services (HHS), "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."  42 U.S.C. § 264(a).  In the statute, Congress further provides that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."  *Id.*  The PSHA also provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority."  *Id.* at § 264(e).

An implementing regulation, now codified at 42 C.F.R. § 70.2, delegates to the CDC Director discretion to take measures to address the spread of communicable diseases.  More specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among states, she may "take such measures to prevent such spread of the diseases as [she] deems reasonably necessary."  42 C.F.R. § 70.2.  CDC's regulations provide for penalties for their violation.  *Id.* § 70.18.

II.    <u>The COVID-19 Pandemic</u>

In December 2019, SARS-CoV-2, a novel coronavirus, was first detected in China.  *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020).  SARS-CoV-2

causes a respiratory disease known as COVID-19 that presents a risk of "severe" respiratory illness that may result in hospitalization, intensive care, or death.  Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292, 55,292 (Sept. 4, 2020).  As the CDC explained, the virus causing COVID-19 transmits "very easily and sustainably" between people within "close contact with one another (within about 6 feet)." *Id.* at 55,293.  Following its initial detection, COVID-19 quickly spread across the world, creating an "historic threat to public health." *Id*. at 55,294; *see also* 85 Fed. Reg. at 15,337.

On January 31, 2020, HHS declared a public health emergency, and on March 11, 2020, the World Health Organization identified COVID-19 as a pandemic.  *See id*. at 15,337.  Two days later, on March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.  *Id*. at 15,337.  To date, COVID-19 has infected more than 44 million people and killed more than 750,000 within the United States.  *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker (last visited Nov. 8, 2021).

III.    CDC's Eviction Moratorium

On September 4, 2020,[1] the CDC issued an order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 temporarily halting residential evictions until December 31, 2020.[2]  85 Fed. Reg. at 55,292.  The Eviction Moratorium provided that "a landlord, owner of a residential property or

---

[1]  The CDC's order followed the issuance of an executive order directing the HHS Secretary to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary" to prevent the spread of COVID-19. Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners, Exec. Order No. 13,945, 85 Fed. Reg. 49,935, 49,936 (Aug. 8, 2020).

[2]  We use the term "Eviction Moratorium" to refer generally to the initial CDC order halting residential restrictions, as well as the subsequent modifications and extensions of that order by the CDC, as well as the more limited order issued in August 2021.

5

other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any State or U.S. territory . . . that provides a level of public-health protections below the requirements listed in [the CDC's] Order." *Id.* at 55,296.

In issuing the Eviction Moratorium, the CDC sought to address the drastic public health consequences arising from potential mass evictions during a global pandemic. The CDC determined that a temporary pause in evictions would help reduce the risk of transmission of COVID-19 by allowing sick persons to self-isolate, by allowing compliance with stay-at-home orders and social distancing measures, by reducing the need for congregate or shared housing, and by helping to prevent homelessness. *Id.* at 55,294. The CDC found that the risk of transmission increased if evicted persons moved into shared housing or into congregate settings, such as homeless shelters or transitional housing where social distancing may be difficult. *Id.* It also found that extensive outbreaks of COVID-19 had already been identified in homeless shelters. *Id.* at 55,295. In addition, the CDC relied on research suggesting that homelessness had been associated with an increased likelihood of hospitalization in patients with COVID-19. *Id.* at 55,296. Accordingly, the CDC determined that mass evictions during the pandemic could exacerbate the negative public health consequences of COVID-19. *See id.* at 55,294-95. Indeed, in issuing the Eviction Moratorium, the CDC relied on research indicating that as many as 30 to 40 million people could be at risk of eviction in the absence of state and local protections, and that mass evictions would likely increase the interstate spread of COVID-19. *Id.*

The CDC targeted the Eviction Moratorium to cover only those individuals who would likely become homeless or be forced to live in shared or congregate housing. *Id.* at 55,293. To be covered, a tenant was required to certify under penalty of perjury that they: (1) "used best efforts to obtain all available government assistance for rent or housing"; (2) met certain income

requirements; (3) could not pay full rent because of "substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) were using best efforts to make partial payments; and (5) had "no other available housing options," and would likely become homeless or be forced to "live in close quarters in a new congregate or shared living setting" upon eviction.  *Id.*

By its terms, the Eviction Moratorium was limited.  It did not relieve a tenant of his obligation to pay rent or comply with any other legal obligations under a lease.  *Id.* at 55,294.  It did not prevent the tenant from accruing fees, penalties, or interest for non-payment of rent, nor did it prohibit the eviction of individuals either who did not qualify as "covered persons," or who were being evicted for reasons other than nonpayment of rent, including engaging in illegal activity.  *Id.* at 55,293-94.  The Eviction Moratorium also did not apply in states with the same level of protection for tenants as the CDC order.  *Id*. at 55,294.  Moreover, it did not prohibit a landlord from commencing an eviction proceeding in state court as long as the physical removal of the tenant did not occur during the moratorium.  *See id*. at 55,293 (defining the term "evict" as meaning "any action" "to remove or cause the removal of a covered person from a residential property"). [3]

---

[3] *See also* CDC/HHS Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, Frequently Asked Questions 1, https://web.archive.org/web/20210726203824/https://www.cdc.gov/coronavirus/2019-ncov/downloads/Eviction-Moratoria-Order-FAQs-02012021-508.pdf (last visited Nov. 10, 2021) ("Nor is [the moratorium] intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."). Because the Eviction Moratorium has expired, this document is no longer available on the CDC website and we have thus cited to an archived image of the page as of July 26, 2021.

IV.    <u>Extensions Of The Eviction Moratorium And Emergency Rental Assistance</u>

In December 2020, Congress extended the Eviction Moratorium through January 31, 2021.  Consolidated Appropriations Act, 2021, § 502, Pub. L. No. 116-260, 134 Stat. 1182, 2078-79 (2020) (2021 Appropriations Act).  Congress, in conjunction with the Eviction Moratorium's extension, also made two appropriations (totaling approximately $46.5 billion) for rental assistance to individuals affected by the pandemic.  First, in the same legislation in which it extended the Eviction Moratorium, Congress appropriated $25 billion in emergency rental assistance for landlords whose tenants had fallen behind in rent due to the pandemic.  *See* 2021 Appropriations Act, § 501, 134 Stat. at 2070-73.  Second, in March 2021, Congress appropriated an additional $21.55 billion in rental assistance.  *See* American Rescue Plan Act of 2021, § 3201(a)(1), Pub. L. No. 117-2, 135 Stat. 4, 54 (2021); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*) (discussing the Eviction Moratorium's impact and noting that "Congress has provided nearly $50 billion in emergency rental assistance").

Following Congress' extension of the Eviction Moratorium in December 2020, the CDC extended it, with minor modifications, three additional times.  *See* 86 Fed. Reg. 8,020 (Feb. 3, 2021) (extension with modifications through March 31, 2021); 86 Fed. Reg. 16,731 (Mar. 31, 2021) (extension with modifications through June 30, 2021); 86 Fed. Reg. 34,010 (June 28, 2021) (extending original order, as modified by subsequent orders, through July 31, 2021); 86 Fed. Reg. 43,244 (Aug. 6, 2021) (new moratorium with more limited geographic scope through October 3, 2021 for persons in areas experiencing substantial or high levels of transmission).

V.    <u>Challenges To The Legality Of The Eviction Moratorium</u>

Various landlords and associations filed actions in Federal district courts, alleging (among other things) that the Eviction Moratorium exceeded the CDC's statutory authority.  In one such case, the United States District Court for the District of Columbia granted plaintiffs summary judgment, ruling that the CDC lacked the statutory authority to issue the Eviction Moratorium.  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, --F. Supp. 3d--, 2021 WL 1779282 (D.D.C. May 5, 2021).  The district court vacated the Eviction Moratorium nationwide but stayed its judgment pending appeal.  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, --F. Supp. 3d--, 2021 WL 1946376, at *4-5 (D.D.C. May 14, 2021).

Ultimately, the Supreme Court vacated the stay of the district court's judgment.  *Ala. Ass'n of Realtors*, 141 S. Ct. at 2486, 2490 (*per curiam*).  The Supreme Court concluded that the landlords were "virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority" and that "it is difficult to imagine them losing."  *Id.* at 2486, 2488.  The Court reasoned that "it is a stretch to maintain that §361(a) gives the CDC authority to impose this eviction moratorium," concluding that the moratorium's "downstream connection between eviction and the interstate spread of disease is markedly different from the direct targeting of disease that characterizes the measures identified in the statute."  *Id.* at 2488.

The Court acknowledged that "the public has a strong interest in combating the spread of the COVID–19 Delta variant," but stated that an agency may not "act unlawfully even in pursuit of desirable ends" and that it  is "up to Congress, not the CDC, to decide whether the public interest merits further action here."  *Id.* at 2490.  In light of the Supreme Court's conclusion, the Government voluntarily dismissed its appeal in *Alabama Association of Realtors*, and the district court's judgment vacating the Eviction Moratorium nationwide thus became final.  *Ala. Ass'n of*

9

*Realtors v. Dep't of Health & Hum. Servs.*, 21-5093, 2021 WL 4057718, at *1 (D.C. Cir. Sept. 3, 2021).

VI.    <u>Amended Complaint Allegations</u>

According to the complaint in this action, plaintiffs are 38 owners of residential rental properties in several states.  Compl. ¶ 9.[4]  Plaintiffs allege that they have "valid, protected, and legally cognizable property interests and property rights in the rental properties they own and in the lease and other contracts associated with those rental properties, including without limitation rights to exclude non-rent paying persons from their properties . . . [and] to recover possession of their property from unwanted occupation."  *Id*. ¶ 34.  Plaintiffs claim that the CDC's Eviction Moratorium caused rental units in properties they own to be "occupied" over their objection by tenants not paying rent, and precluded them from evicting these tenants and re-leasing the units.  *Id*. ¶¶ 9, 23-25, 28.  According to plaintiffs, the Eviction Moratorium "constitutes a compensable physical taking because it has effected a Government-authorized physical invasion, occupation, or appropriation of Plaintiffs' private property, for the Government itself or for third parties."  *Id*. ¶¶ 36.

In the alternative, plaintiffs allege that the Eviction Moratorium "constitutes an illegal exaction because the CDC exceeded and contravened its statutory and regulatory authority under section 361 of the Public Health Service Act."  *Id*. ¶ 42.  According to plaintiffs, "as a direct result of the Government's illegal action or improper application of law, the Government has

---

[4]  "Complaint" or "Compl." refers to plaintiffs' first amended complaint.  Facts derived from plaintiffs' complaint are accepted as true solely for the purposes of this motion to dismiss.  *See, e.g., Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

exacted Plaintiffs' private property and property interests," and "enriched the Government at Plaintiffs' expense." *Id*. ¶ 42.

Plaintiffs seek an order finding that the Government affected a taking or illegal exaction by issuing the Eviction Moratorium, and an award of just compensation for the taking or illegal exaction, as well as interest and attorneys' fees. *Id*. Prayer for Relief.

ARGUMENT

I.    Standard Of Review

In addressing a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted). Plaintiffs "bear[] the burden of establishing the court's jurisdiction over [their] claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. (citing *Henke*, 60 F.3d at 797). In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), however, the Court may consider evidentiary matters outside the pleadings. *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

To avoid dismissal for failure to state a claim under RCFC 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367 (Fed. Cir. 2012) (citation omitted). "The facts as alleged 'must be enough to raise a right to relief above the speculative, on the

11

assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id*. at

1367-68 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  The "complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "At the

same time, a court is 'not bound to accept as true a legal conclusion couched as a factual

allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

II.    The Supreme Court's Ruling And District Court Judgment Regarding The Lack Of
       Authority For The Eviction Moratorium Preclude Plaintiffs' Takings Claims

       For more than a century, the Supreme Court has reiterated the principle that actions not

authorized by Congress cannot subject the United States to liability under the Just Compensation

Clause.  *See, e.g.*, *Hooe v. United States*, 218 U.S. 322, 335 (1910).  As explained above, the

Supreme Court concluded that it was "virtually certain" that the CDC's Eviction Moratorium

was not authorized by Congress and that "it was difficult to imagine [landlords] losing" their

challenge to the Eviction Moratorium on that ground.  Accordingly, the government dismissed

its appeal in that case and the district court's judgment vacating the Eviction Moratorium on the

ground that it was unauthorized became final.  *See supra*, p. 10.  Plaintiffs' complaint

specifically acknowledges the Supreme Court's ruling in stating that "[t]he effectiveness of the

CDC Order ended on August 26, 2021, as a result of litigation challenging the CDC's authority

to issue the CDC Order."  Compl. ¶ 27 (citing the Supreme Court's *per curiam* order in *Ala.

Ass'n of Realtors*).  Because the agency action alleged to have caused a taking was unauthorized,

12

it cannot form the basis of a takings claim and that claim must be dismissed.  *See S. Cal. Fin. Corp. v. United States*, 634 F.2d 521, 523 (Ct. Cl. 1980).[5]

"It is [ ] well settled[ ] that a compensable taking arises only if the Government's conduct in question was authorized."  *A-1 Cigarette Vending, Inc. v. United States*, 49 Fed. Cl. 345, 351 (2001).  The United States is liable only if "the officer who has physically taken possession of the property was duly authorized to do so, either directly by Congress or by the official upon whom Congress conferred the power."  *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920).  If, however, an officer acts "by virtue alone of his office, and *without the authority of Congress* . . . , he will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the government, 'founded upon the Constitution.'"  *Hooe*, 218 U.S. at 335 (original emphasis).  This is because an "unauthorized taking" is "in no sense an exercise of the power of eminent domain."  *United States v. Goltra*, 312 U.S. 203, 211 (1941).  Compensating a plaintiff for a taking that was not authorized "would strike a blow at the power of the purse," which is "[t]he exclusive assignment" of Congress and "the foundation of [American] liberties."  *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978).

In numerous cases, the Supreme Court has found that the United States is only liable for takings authorized by Congress.  For example, in 1888, the Supreme Court cautioned that while the United States was required "to make just compensation" for the lands the Secretary of War

---

[5] Some courts have dismissed takings claims premised on unauthorized action for want of jurisdiction.  *See, e.g.*, *Straw v. United States*, No. 2021-1600, 2021 WL 3440773, at *1 (Fed. Cir. Aug. 6, 2021) (*per curiam*).  The analysis in those cases is identical to the analysis set forth in this section.  For that reason, the Government has also moved to dismiss the complaint under Rule 12(b)(1).

acquired to construct a dam, it was "not to be understood as saying that the [S]ecretary of [W]ar could, by any act of his, bind the United States to pay for lands taken by him which, manifestly, had no substantial connection" with the "purposes described in the act of [C]ongress." *Great Falls Mfg. Co. v. Garland*, 124 U.S. 581, 597 (1888).

Similarly, in *Hooe*, the Civil Service Commission leased an office building, but not its basement, from the plaintiffs, yet nonetheless occupied the basement for five years. Each year, the Commission paid to plaintiffs the full amount of money appropriated by Congress for the agency's annual rent. Alleging that they were owed additional compensation for the basement's occupation, the plaintiffs brought, *inter alia*, a takings claim against the United States. *See Hooe*, 218 U.S. at 327-29.

Although the Supreme Court recognized that the plaintiffs were "justly entitled to have received" compensation for the Commission's use of the basement, *id.* at 334, it nevertheless rejected the plaintiffs' takings claim. As the Court explained, "[i]t cannot be said that any claim for a specific amount of money against the United States is founded on the Constitution, unless such claim be either expressly or by necessary implication authorized by some valid enactment of Congress." *Id*. at 335. If "an officer of the United States" takes private property "for public use, without being authorized, expressly or by necessary implication to do so by some act of Congress," that taking "is not the act of the government." *Id*. at 336. Because the plaintiffs "received [in rent] the entire sums which Congress appropriated to be paid out of the Treasury on account of rent of buildings or quarters for the Civil Service Commission," the plaintiffs' claims were not "founded upon the Constitution" and they could not "maintain [their] *suit* against the government." *Id*. (original emphasis); *see also N. Am. Transp. & Trading Co.,* 253 U.S. at 334 (valid takings claim against the United States only arose upon exercise of valid statutory

14

authority—earlier occupation of land by officer without statutory authority "created no liability on the part of the government." (citing *Higo v. United States*, 194 U.S. 315, 323 (1904))); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582-89 (1952) (rejecting Government's argument that enjoining President's unauthorized steel mill seizure was unnecessary as plaintiffs could recover just compensation in the Court of Claims, noting that "[p]rior cases in this Court have cast doubt on the right to recover in the Court of Claims on account of properties unlawfully taken by government officials for public use."); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 127 n.16 (1974) ("Government action must be authorized"; "'private property [taken] by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government,' and hence recovery is not available in the Court of Claims." (quoting *Hooe*, 218 U.S. at 336)).

Relying on this line of Supreme Court cases, the Federal Circuit and its predecessor have consistently dismissed takings claims premised on unauthorized government actions. *See Straw*, 2021 WL 3440773, at *4 (holding that the Court of Federal Claims did not err in dismissing plaintiff's complaint where plaintiff "alleged no facts to show that the alleged conduct was authorized at all" and his "assertions . . . naturally lead to the [ ] conclusion[ ] that the conduct was not authorized"); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 (Fed. Cir. 2005). (holding that "the Court of Federal Claims properly dismissed the complaint" because plaintiffs' "takings claim was premised on the allegations that the" federal agency "violated the [applicable] statute and regulations"); *Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000) (dismissing takings claim where "FEMA acted contrary to" the applicable regulations); *Short v. United States*, 50 F.3d 994, 1000 (Fed. Cir. 1995) (holding that there was no taking when "the Secretary's actions in making *per capita* payments only to the Hoopa Valley Tribe

15

members were unauthorized"); *S. Cal. Fin. Corp.*, 634 F.2d at 523  (affirming the trial court's

dismissal of a case where the Air Force lacked authority "to take a fee or perpetual easement,"

which "could be given only in a Military Construction Appropriation Act, and the Air Force

deliberately refrained from seeking such congressional sanction"); *NBH Land Co.*, 576 F.2d at

319 (holding that the Army did not engage in a taking when it expanded its military base because

Congress's "only connection with a proposed land acquisition has been to reject it"); *Sun Oil Co.

v. United States*, 572 F.2d 786, 772 (Ct. Cl. 1978) (*per curiam*) (relying on an opinion by the

Ninth Circuit interpreting the law supposedly authorizing agency action to "hold[ ] that the

Secretary was without authority to take an OCSL Act lessee's leasehold rights"); *Coast Indian

Cmty. v. United States*, 550 F.2d 639, 652 (Ct. Cl. 1977) (holding that "the sovereign cannot be

held liable under the [F]ifth [A]mendment, as no constitutional taking occurred" when the

challenged act was "beyond the authority of the Government agents involved").

In a similar situation, this Court held in four separate cases that agency action that the

Supreme Court subsequently found to be unauthorized cannot give rise to takings liability.

These cases are highly instructive and consistent with the binding precedent set forth above.  *See

A-1 Cigarette Vending, Inc.*, 49 Fed. Cl. 345; *Bd. Mach., Inc. v. United States*, 49 Fed. Cl. 325

(2001); *Brubaker Amusement Co. v. United States*, No. 98-511C, 2001 U.S. Claims LEXIS 89

(Jan. 12, 2001); *A-1 Amusement Co. v. United States*, 48 Fed. Cl. 63 (2000).

In these cases, the Food and Drug Administration (FDA) published final regulations

relating to the sale and distribution of cigarettes and other tobacco products.  Among other

things, the regulations limited the sale of tobacco products from vending machines to locations

where the patrons were over the age of eighteen.  The plaintiffs in each suit were cigarette-

vending-machine owners and/or operators that sued the United States, arguing that the

16

regulations were a taking.  *See A-1 Cigarette Vending, Inc.*, 49 Fed. Cl. at 346-48; *Bd. Mach.*, 49 Fed. Cl. at 326-27; *Brubaker Amusement Co.*, 2001 U.S. Claims LEXIS 89 at *1-2; *A-1 Amusement Co.*, 48 Fed. Cl. at 64-65.  While these cases were pending, the Supreme Court decided *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), in which it held that "it is plain that Congress has not given the FDA the authority" to regulate tobacco products as customarily marketed.  *Id*. at 161.

In all four cases, this Court dismissed the vending machine owner/operators' suits for failure to state a claim upon which relief can be granted.  *A-1 Cigarette Vending, Inc.*, 49 Fed. Cl. at 364; *Bd. Mach.*, 49 Fed. Cl. at 336; *Brubaker Amusement Co.*, 2001 U.S. Claims LEXIS 89 at *1; *A-1 Amusement Co.*, 48 Fed. Cl. at 68.  Each of the cases was dismissed on the ground that, given that the Supreme Court ruled that the FDA acted without authority in enacting the regulations, plaintiffs could not a state a takings claim based upon such unauthorized actions. *See A-1 Cigarette Vending, Inc.*, 49 Fed. Cl. at 355 (dismissing takings claim because "[t]he Supreme Court determined in *Brown & Williamson* that the FDA had no authority to regulate cigarettes and smokeless tobacco as commonly marketed, and therefore, no compensable taking may arise"); *Bd. Mach.*, 49 Fed. Cl. at 331, 335-36 (dismissing takings claim where the "FDA's actions were clearly outside of the scope of their authority," in light of the Supreme Court's ruling); *Brubaker Amusement Co.*, 2001 U.S. Claims LEXIS 89 at *7-8 (dismissing takings claim because the "FDA's actions in this case clearly were unauthorized"); *A-1 Amusement Co.*, 48 Fed. Cl. at 68 (finding no taking where "[t]he Supreme Court has determined that FDA lacked the authority to promulgate the regulations at issue" because "Government action which exceeds

17

valid statutory authority cannot give rise to a taking claim" (quotation, citations, and footnote omitted)).[6]

As with the cigarette-vending-machine owners, plaintiffs here are not entitled to just compensation based upon an action the Supreme Court concluded was "virtually certain" to have been without congressional authorization, and which the district court has vacated as unauthorized. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 803 (Fed. Cir. 1993) ("If the taking is unauthorized, the acts of defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of . . . entitlement to just compensation in the owner or former owner." (quotation and citation omitted)). Instead, the only path available to the plaintiffs would be to seek an injunction or a declaratory judgment against the unlawful action in district court. *See S. Cal. Fin. Corp.*, 634 F.2d at 526 n.8 ("Ordinarily, whenever there is no authority for a taking or intrusion, the claimant, although unable to obtain compensation, can seek an injunction or a declaratory judgment against the unauthorized governmental activities."). Notably, the district court already issued a final declaratory judgment vacating the Eviction Moratorium. *See Ala. Ass'n of Realtors*, 2021 WL 4057718, at *1. Accordingly, plaintiffs' takings claims must be dismissed.[7]

---

[6] In a fifth related case, *B & G Enterprises, Ltd. v. United States*, 48 Fed. Cl. 866 (2001), this Court dismissed the plaintiff's claim on the grounds that the regulations were never enforced because they were enjoined before they went into effect. *See id*. at 868-69. The Federal Circuit upheld three of the five decisions, *A-1 Cigarette Vending*, *B & G Enterprises*, and *Brubaker Amusement*, on this alternative ground in *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 160 (Fed. Cir. 2002). The Federal Circuit did not reach the lack of authority issue, and the other two decisions, *A-1 Amusement* and *Board Machine*, were not appealed.

[7] In December 2020, Congress briefly extended the CDC's September 4, 2020 order through January 31, 2021, Pub. L. 116-260 § 502. However, plaintiffs have not alleged that this 31-day moratorium period standing alone effected a taking. And such a claim, if alleged, would

III.    Assuming The Moratorium Was Authorized, Plaintiffs Lack A Cognizable Property
        Interest Because The CDC's Longstanding Statutory Authority Inhered In The Title To
        Plaintiffs' Property

If plaintiffs attempt to argue that the CDC had authority to issue the Eviction

Moratorium, plaintiffs' takings claims would still fail.  Given the Supreme Court's ruling and the

district court's final judgment, it is not clear how plaintiffs could contend that the CDC was

authorized to issue the Eviction Moratorium under section 361.  However, to the extent plaintiffs

attempt to make this seemingly implausible argument, then the pre-existing statutory authority in

section 361 would inhere in the title to plaintiffs' property, thereby precluding takings claims

based on the CDC's exercise of that authority.  *See, e.g.*, *Bair v. United States*, 515 F.3d 1323,

1327 (Fed. Cir. 2008).  Under those circumstances, plaintiffs would lack a cognizable property

interest in physically removing tenants during the COVID-19 pandemic because of

"longstanding background restrictions on [their] property rights."  *Cedar Point Nursery v.*

*Hassid*, 141 S. Ct. 2063, 2079 (2021).

 "To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a

legally cognizable property interest."  *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384-

85 (Fed. Cir. 2019) (citation omitted); *see also Gadsden Indus. Park, LLC v. United States*, 956

F.3d 1362, 1368 (Fed. Cir. 2020) ("The plaintiff in a takings case bears the burden to

demonstrate a protectable property interest." (citation omitted)).  "It is axiomatic that only

persons with a valid property interest at the time of the taking are entitled to compensation."

*Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (citations omitted).  However,

because the Fifth Amendment "protects rather than creates property interests, the existence of a

---

fail for the reasons outlined in Section IV, below.

19

property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (citation omitted).

It is well established that certain "background principles" of law may "inhere" in the title of property to limit property rights, and thereby preclude establishment of a cognizable taking under the Fifth Amendment. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992); *see Cedar Point*, 141 S. Ct. at 2079 (stressing that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights"); *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152-53 (Fed. Cir. 2014); *Bair*, 515 F.3d at 1327-28. Accordingly, "the [G]overnment does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property] owner's title.'" *Cedar Point*, 141 S. Ct. at 2079 (quoting *Lucas*, 505 U.S. at 1028-29).

In their complaint, plaintiffs allege that their property interests include the right "to exclude non-rent paying persons from their properties . . . [and] to recover possession of their property from unwanted occupation." Compl. ¶ 34. Central to these allegations is the claim that plaintiffs' "right to exclude" precludes any Government action postponing the physical removal of tenants for non-payment of rent. *See id.* ¶ 31. However, based on longstanding background restrictions on their property rights, plaintiffs cannot plausibly establish a cognizable property interest in being free from the Eviction Moratorium's temporary restrictions.

As explained above, in light of the Supreme Court's determination that it was "difficult to imagine" landlords losing their argument that the Eviction Moratorium lacked statutory authorization, an outcome it concluded to be "virtually certain," there is no basis for plaintiffs to contend that the CDC nevertheless had authority to issue it. *See supra* Section II. In any event,

20

such an argument would fail for the separate reason that if the CDC did have authority to issue

the Eviction Moratorium, then this pre-existing authority would be fatal to their takings claims

because it would establish that the Government's actions arose from a longstanding, pre-existing

Federal statute regulating the transmission of communicable diseases, which permits the

Government to restrict property rights as necessary to protect the public health.  *See Bair*, 515

F.3d at 1329 (explaining that "a federal statute or authority can constitute a 'background

principle' that inheres in the title to property interests arising after its enactment, therefore

precluding a takings claim based on the application of the statute to those property interests").

Indeed, the Federal Circuit has repeatedly recognized that the presence of a pre-existing

Federal statute or authority restricting property interests precludes the establishment of a

cognizable property interest for takings purposes.  *See, e.g.*, *McCutchen v. United States*, 14

F.4th 1355, 1365-66 (Fed. Cir. 2021) (holding that Federal firearms statutes precluded

cognizable property interest in continued possession of bumpstocks); *Bair*, 515 F.3d at 1329; *Air

Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1218 (Fed. Cir. 2005) (finding that

Federal statute concerning navigable air space precludes plaintiff possessing cognizable property

interest); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1379-80 (Fed. Cir. 2004)

(finding no cognizable property interest where the Magnuson-Stevens Act constituted a

background principle that inhered in the title to plaintiff's property); *M & J Coal Co. v. United

States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (finding plaintiff's mining rights limited by Federal

Government's authority under 30 U.S.C. § 1271); *Mitchell Arms, Inc. v. United States*, 7 F.3d

212, 217 (Fed. Cir. 1993) (finding no cognizable property interest in importing firearms where

property right was subject to Federal statutory regulation of firearms); *Cal. Hous. Sec., Inc. v.

21

*United States,* 959 F. 2d 955, 958-59 (Fed. Cir. 1992) (Federal regulation of banking provided that plaintiffs possessed "less than the full bundle of property rights").

With respect to the CDC's Eviction Moratorium, the Federal Government has long enacted measures to prevent the spread of communicable disease. Congress enacted the first Federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct Federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799). Consistent with its authority to regulate the interstate spread of disease, in 1944, Congress enacted the statute at issue—section 361(a) of the PSHA.

Relying on section 361 and its corresponding regulation, 42 C.F.R. § 70.2, the CDC determined that a "temporary halt in evictions" was a "reasonably necessary measure" to prevent the further spread of COVID-19 throughout the United States." 85 Fed. Reg. at 55,296. Accordingly, if plaintiffs contend that the Eviction Moratorium was statutorily authorized, section 361's pre-existing provisions would inhere in the title to plaintiffs' rental properties and preclude plaintiffs from plausibly establishing a cognizable property interest in being free from the moratorium's temporary restrictions. *See, e.g., Bair*, 515 F.3d at 1329.

IV.    The Police Power Doctrine Precludes The Finding Of A Cognizable Taking

Plaintiffs also cannot establish cognizable takings claims because the Government was acting pursuant to its police power in temporarily postponing the removal of tenants during a public health emergency, the type of government action long held not to implicate the Takings Clause. *See Block v. Hirsh*, 256 U.S. 135, 154-55 (1921).[8] Courts have held that there are

---

[8]  Unlike the states, the Federal Government does not possess a plenary police power. But, the Federal government may exercise its enumerated powers to advance public safety objectives, and when it does, it is exercising the same kind of authority as when States act

certain exercises "of the police power that ha[ve] repeatedly been treated as legitimate even in the absence of compensation to the owners of the property." *Acadia Tech,* 458 F.3d at 1332-33; *see Lucas*, 505 U.S. at 1027-28; *Miller v. Schoene,* 276 U.S. 272, 279-80 (1928); *Kam-Almaz v. United States*, 682 F.3d 1364, 1371 (Fed. Cir. 2012); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008). In particular, "certain government actions in furtherance of the health, safety, and general welfare of the public have a 'special status' within our takings jurisprudence. *McCutchen*, 14 F.4th at 1374 (citation omitted) (Wallach, concurring).

Although the "precise contours" of the police power doctrine are "difficult to discern," *AmeriSource*, 525 F.3d at 1153, in the most factually analogous situation, the Supreme Court has already held that a temporary, two-year eviction moratorium during the time of a public health emergency constituted a legitimate exercise of the police power, and not a taking. *Block*, 256 U.S. at 154-55. More specifically, in *Block*, the Court held that a temporary emergency measure freezing rent and allowing tenants to hold over leases in light of wartime exigencies was "clothed ... with a public interest so great as to justify regulation by law." *Block*, 256 U.S. at 155. In reaching its decision, the Court distinguished between "the doctrine of eminent domain, under which what is taken is paid for, [and] the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay." *Id*. The Court found that "a

---

pursuant to their plenary police power—an action long recognized *not* to implicate the Fifth Amendment's Just Compensation Clause. *See, e.g.*, *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332-33 (Fed. Cir. 2006); *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 n.17 (Fed. Cir. 1994) ("The term 'police power' is used herein to refer to the power of the federal government to engage in activities not unlike those engaged in by the states under their inherent sovereign powers, recognizing that the power in the federal system is of Constitutional origin.").

public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation." *Id.* at 156.

Here, the CDC issued the Eviction Moratorium to "prevent the further spread of COVID-19 throughout the United States." 85 Fed. Reg. at 55,296. There is no dispute that the Eviction Moratorium was temporary, *see* Compl. ¶ 27, and the COVID-19 pandemic is "a historic threat to public health." *See* 85 Fed. Reg. at 55,294 (finding that "COVID-19 presents a historic threat to public health"). Accordingly, *Block*'s longstanding principle that the Government may invoke its police powers to enact temporary restrictions on the ability of landlords to evict tenants during an emergency precludes any takings claims here. *See Block*, 256 U.S. at 155-57.

V.    **Even If Assessed Under The Takings Clause, Plaintiffs Fail To State A Valid Claim For Relief**

A.    **The CDC Eviction Moratorium Was Not A *Per Se* Physical Taking**

Plaintiffs allege in their complaint that "the CDC Order constitutes a physical taking because it has effected a Government-authorized physical invasion, occupation, or appropriation of Plaintiffs' private property, for the Government itself or for third parties." Compl. ¶ 3. In fact, plaintiffs *only* allege a *per se* physical taking in their complaint. There are no allegations in the complaint that the government effected a regulatory taking, which the Court would assess under the familiar *Penn Central* factors. Yet, plaintiffs' claim of a physical taking is foreclosed as a matter of law.

"The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land. 'This element of required acquiescence is at the heart of the concept of occupation.'" *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527-28 (1992) (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)) (original emphasis). The Supreme

Court has recently clarified the line that separates a physical taking from an action that courts must analyze under a regulatory taking framework. "The essential question," the Court explained, "is whether the government has physically taken property for itself or someone else— by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery*, 141 S. Ct. at 2072 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321-23 (2002)).

No question exists as to which side of that line the Eviction Moratorium falls. In *Tahoe-Sierra*—the case that the *Cedar Point* Court cites in drawing the line between physical appropriations and regulatory restrictions—the Supreme Court specifically recognized that "a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking." 535 U.S. at 322-23 (citing *Block*); *see also Brown v. Legal Found. of Wash.*, 538 U.S. 216, 233-34 (2003) (quoting *Tahoe-Sierra* for the same proposition). Instead, the courts must assess such actions under a regulatory-taking rubric. *Tahoe-Sierra*, 535 U.S. at 323 (citing *Yee,* 503 U.S. at 523).

In *Tahoe-Sierra*, the Court stressed that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Id*. at 323-24 ("[P]hysical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights."). Landowners in *Tahoe Sierra* challenged a two-year and an eight-month moratorium, which "effectively prohibited all construction" on their land for 32 months. *Id*. at 311-12. The Court held that the challenged moratoria did "not present the 'classi[c] taking' in which the government directly appropriates private property for its own use." *Id*. at 324 (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998)). "[I]nstead the interference with property rights 'arises from some

public program adjusting the benefits and burdens of economic life to promote the common good,'" and thus required analysis under a regulatory takings framework. *Id*. at 324-25 (quoting *Penn Cent. Transp. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).

In *Yee*, the Supreme Court dealt squarely with a challenge to a law that restricted the ability of property owners to evict their tenants. The Court rejected the argument of a group of property owners who alleged that a California city's rent control ordinance, in conjunction with a state statute that limited their ability to evict tenants, effected a physical taking. 503 U.S. at 527-28. The property owners claimed that the laws allowed tenants a right to occupy their property indefinitely and therefore constituted a government authorized physical invasion. *Id*. at 526-27. The Court held to the contrary and ruled that because the property owners "voluntarily rented" their property to their tenants, there was no government-compelled occupation. *Id*. at 527-28. "Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." *Id*. at 528 (citing *Fla. Power*, 480 U.S. at 252–253).

The *Yee* Court noted that though the right to exclude is an important property interest, it had not been taken from the property owners on the face of the laws. *Id*. Instead, the Court held, "[o]n their face, the state and local laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant." *Id*. (original emphasis).[9] The

---

[9] In the Supreme Court's *per curiam* order regarding the Eviction Moratorium, the Court stated that "preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). *Loretto* was a takings case in which the Court distinguished between the physical occupation of a landlord's property by third parties, which can give rise to a physical taking, and the regulation of landlord-tenant relations, which cannot. *Loretto*, 458 U.S. at 440.

Court added that it "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Id*. at 528-29 (quoting *Loretto*, 458 U.S. at 435); *see also Fla. Power*, 480 U.S. at 252 ("As we observed in *Loretto,* statutes regulating the economic relations of landlords and tenants are not *per se* takings."); *Pennell v. City of San Jose*, 485 U.S. 1, 12 n.6 (1988) (same).  The Court explained further that takings challenges to laws regulating the relationship between a landlord and a tenant, "are analyzed by engaging in the 'essentially ad hoc, factual inquiries' necessary to determine whether a regulatory taking has occurred." *Yee*, 503 U.S. at 529 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979)).

The arguments asserted by plaintiffs here mirror those rejected by the Supreme Court in *Yee.*  Plaintiffs, like the property owners in *Yee*, contend that a restriction on their ability to evict tenants "constitutes a physical taking" that effects a "Government-authorized physical invasion, occupation, or appropriation of Plaintiffs' private property."  Compl. ¶ 3.  And, just like the property owners in *Yee*, plaintiffs have voluntarily leased and invited tenants on to their property.

---

In citing *Lorretto* in its order, the Court was not evaluating whether the Eviction Moratorium was a taking—the question of whether there was a taking was not even before the Court.  Unlike *Yee*, in which the Court applied *Loretto* in deciding whether a law regulating the landlord-tenant relationship effected a taking, the Court in *Alabama Association of Realtors* referred to *Loretto* in the context of whether a stay pending appeal of the district court's declaratory ruling setting aside the Eviction Moratorium would cause the plaintiffs to face irreparable harm from unauthorized Government action.  The Supreme Court's determination that setting aside the stay was necessary to protect landlords from irreparable economic harm is further evidence that the Court did not consider the moratorium to be a taking.  If the Government's action amounted to a taking, then the property owners would have had a just compensation remedy and setting aside the stay would not have been necessary.  *See Brown*, 538 U.S. at 235.

27

*See* Compl. ¶ 34 (alleging that plaintiffs have property interests in the rental properties they own and the leases associated with such properties).

Because plaintiffs voluntarily invited tenants on to their property, and the Eviction Moratorium merely regulated that pre-existing landlord-tenant relationship, there is no government authorized occupation of plaintiffs' property and thus no physical taking.  *Yee*, 503 U.S. at 527-28.  Indeed, several district courts have recently applied *Yee* to find no physical taking—or no likelihood of success on such a claim—respecting state eviction moratoriums enacted due to COVID-19.  *See Jevons v. Inslee*, 1:20-CV-3182-SAB, 2021 WL 4443084, at *14 (E.D. Wash. Sept. 21, 2021) ("Plaintiffs' right to exclude has not been taken because the moratorium compelled no physical invasion or occupation. . . . Instead, the eviction moratorium regulates the landlord-tenant relationship once it is already established." (citing *Yee*, 503 U.S. at 532-33)); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020) ("The [eviction moratorium] at issue here, also like the state and local laws in *Yee*, 'merely regulate [Plaintiffs'] use of their land by regulating the relationship between landlord and tenant.'" (quoting *Yee*, 503 U.S. at 528)); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020) ("As in *Yee*, the Moratorium did not compel plaintiffs to rent their properties.  Rather, plaintiffs voluntarily chose to rent to their tenants prior to the Act." (citing *Yee*, 503 U.S. at 528)); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 163 (S.D.N.Y. 2020) (holding that New York's eviction moratorium did not constitute a physical taking because "the Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted" (citing *Yee*, 503 U.S. at 527-28)), *appeal dismissed as moot sub nom. 36 Apartment Assocs., LLC v. Cuomo*, No. 20-2565-CV, 2021 WL 3009153 (2d Cir. July 16, 2021); *Heights Apartments, LLC v. Walz*, 510 F. Supp. 3d 789, 812 (D. Minn. 2020) (holding

28

that the Minnesota eviction moratorium does not constitute a physical taking, because "as in *Yee*, where the Supreme Court held there was no taking, the Landlords voluntarily rented units in their buildings to their tenants." (citing *Yee*, 503 U.S. at 527)), *appeal docketed*, No. 21-1278 (8th Cir. Feb. 5, 2021).

The Eviction Moratorium is thus readily distinguishable from the most recent Supreme Court case to hold that a regulation effected a physical taking. In *Cedar Point*, the California regulation at issue allowed union organizers, who otherwise had no access to the plaintiffs' property, to enter that property throughout the year. 141 S. Ct. at 2069-70. As the Court explained, "limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *Id*. at 2077. Here, like in *Yee*, plaintiffs have opened their premises to their tenants and granted them access through their leases. *See Jevons*, 2021 WL 4443084 at \*14 ("Unlike the physical appropriation of the right to exclude in *Cedar Point Nursery*, the [eviction] moratorium regulates the landlords 'use of their land by regulating the relationship between landlord and tenant.'" (quoting *Yee*, 503 U.S. at 528)). "When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property" the *Penn Central* regulatory framework applies. *Cedar Point*, 141 S. Ct. at 2071. Thus, plaintiffs could not rely on *Cedar Point* to argue that the Eviction Moratorium constituted a physical taking.

As such, to the extent that plaintiffs have a property interest that is subject to a takings analysis, any such claim must be analyzed, not as a physical taking, but under the flexible framework of *Penn Central*. *See Jevons*, 2021 WL 4443084 at \* 13 ("To find that the [Washington State] eviction moratorium is a *per se* physical taking would require the Court to

29

disregard the U.S. Supreme Court's holdings and rationale in both *Loretto* and *Yee*."). As shown

below, when assessed under *Penn Central*, plaintiffs fail to state a claim for a regulatory taking.

> **B.      Plaintiffs Fail To Meet The Requirements of *Penn Central* For Stating A Regulatory Takings Claim**

Plaintiffs never allege that the CDC's actions in enacting the Eviction Moratorium

amounted to a regulatory taking under *Penn Central*.  In any event, plaintiffs fail to allege

sufficient facts in their complaint to allow the Court to conclude that they have stated regulatory

takings claims that would entitle them to just compensation.  The Supreme Court has held that

whether a regulatory taking has occurred "depends largely 'upon the particular circumstances [in

that] case."  *Penn Cent.*, 438 U.S. at 124 (quoting *United States v. Cent. Eureka Mining Co.*, 357

U.S. 155, 168 (1958)).  Pleading a regulatory takings claim requires plaintiffs to show "the

economic impact of the regulation," "the extent to which the regulation has interfered with

distinct investment-backed expectations," as well as the "character of the governmental action."

*Id*. at 124.  Plaintiffs have failed to adequately plead any of these elements.

> **1.      Plaintiffs Have Failed To Plead Economic Impact**

Plaintiffs have not adequately pleaded that the Eviction Moratorium had any actual

economic impact on them.  Instead, plaintiffs make conclusory allegations regarding supposed

financial losses, without any supporting details or explanations.  *See e.g.*, Compl. ¶ 10 ("Each of

the Plaintiffs has suffered financial losses as a direct result of the CDC Order due to the non-

payment of due and owing rental payments by tenants who have invoked the protections of the

CDC Order, and who would have been subject to eviction but for the CDC Order.").  Such bare-

bones allegations of economic loss fail to satisfy basic pleading standards, which require that a

plaintiff describe their loss and its connection to the defendant's alleged actions.  *See Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (holding complaint to be legally insufficient and observing that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind").

The Supreme Court has held "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values," without effecting a taking. *Penn Cent.*, 438 U.S. at 124-25; *see also Andrus v. Allard*, 444 U.S. 51, 65 (1979) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." (quoting *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 413 (1922))). For a plaintiff to state a valid regulatory-takings claim it must allege sufficient facts in its complaint to show the but-for impact that the Government's actions had on its property. *See A&D Auto Sales,* 748 F.3d at 1157 (holding that "there can be no regulatory taking without a showing of but-for decline in value"). "[I]f the regulatory action is not shown to have had a negative economic impact on the [plaintiff's] property, there is no regulatory taking." *Id*. (quoting *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999)).

Here, none of the plaintiffs has pleaded any facts regarding the value their property would have had on the date of the claimed taking were it not for the enactment of the Eviction Moratorium. Moreover, based upon the facts alleged in the complaint, it is doubtful that plaintiffs could have asserted such a but-for economic impact as the Eviction Moratorium was temporary and "a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Tahoe-Sierra*, 535 U.S. at 332. Further, the Eviction Moratorium expressly provided that it had "no effect on the contractual obligations of renters to pay rent and shall not preclude charging or

31

collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract." 85 Fed. Reg. at 55,296. A government measure that merely precluded plaintiffs from forcing tenants to move out during a pandemic, without relieving those tenants of their obligation to pay rent (plus interest and penalties), does not cause economic impact rising to the level of a Fifth Amendment taking. *See Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996) (holding that rent control laws did not constitute a regulatory taking because "although [plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents." (citing *Bowles v. Willingham,* 321 U.S. 503, 517 (1944))).

Moreover, plaintiffs fail to plead economic impact adequately for two additional reasons. First, a regulatory takings analysis must account for the "parcel as a whole." *Tahoe-Sierra*, 535 U.S. at 331 (citation omitted). Thus, the Supreme Court has held that in takings cases courts must not divide a single parcel of property into individual pieces and determine whether rights in a single piece have been destroyed. *Penn Cent.*, 438 U.S. at 130. Instead, courts must examine the overall effect on the entire piece of property. *Id*. at 130-31.

Considering the entire property, and not just the affected portion in isolation, is critical because a regulatory taking only occurs when the property owner suffers significant economic harm. *See Cienega Gardens v. United States*, 503 F.3d 1266, 1282 (Fed. Cir. 2007) ("Consideration of the property as a whole is particularly important because our cases have established that a regulatory taking does not occur unless there are serious financial consequences."). In another case involving an owner of an apartment complex, the Federal Circuit held that an economic impact of 18 percent was not enough to support a regulatory

takings claim.  *CCA Assocs. v. United States*, 667 F.3d 1239, 1245-46 (Fed. Cir. 2011).  In fact, the Court noted that it was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent."  *Id*. at 1246; *see also Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (rejecting takings claim based upon plaintiff's alleged 46 percent decrease in net worth and observing that "our cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking.").

Here, plaintiffs claim to be owners of residential rental properties.  *See* Compl. ¶ 9.  In most instances, the plaintiffs' properties include numerous units—often in the hundreds of units and sometimes in the thousands.  *See, e.g.*, *id*. at ¶ 9(1) (Darby Development Company owns more than 1,500 units); ¶ 9(9) (Intercoastal Yacht Club, LLC owns 795 units in Florida); ¶ 9(10) (R. James Properties, Inc. owns more than 3,100 units in Georgia).  In fact, all but nine of the 38 plaintiffs own a hundred or more units.[10]  *See id*. at ¶ 9.  Yet, none of the plaintiffs provides any detail about the number of units on their property impacted by the Eviction Moratorium.  Without this basic information, plaintiffs fail to state a claim for a regulatory taking.

Second, the economic impact analysis for a regulatory takings claim must also consider the offsetting benefits provided to the property owner by the regulation at issue.  *See Cienega Gardens,* 503 F.3d at 1282-83 (holding this Court erred "in its failure to consider the offsetting benefits that the statutory scheme afforded which were specifically designed to ameliorate the impact of the [statutory] restrictions.").  In their complaint, plaintiffs ignore the fact that in

---

[10]  Of the 38 plaintiffs, only three own just a single unit.  *See* Compl. ¶¶ 9(4), (7), and (8).  Those single-unit owners, like the rest of the plaintiffs, do not identify the but-for economic impact resulting from the Eviction Moratorium.

conjunction with the Eviction Moratorium, Congress made two appropriations totaling $46.5 billion for rental assistance for individuals affected by the pandemic. *See* 2021 Appropriations Act, § 501, 134 Stat. at 2070-73; American Rescue Plan Act, § 3201(a)(1), 135 Stat. 4, 54. Indeed, in a different context, the Supreme Court stated that the rental assistance provided by Congress is "a reasonable proxy of the moratorium's economic impact." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Here, plaintiffs' failure to address the extent to which they have benefitted from such Federal rental assistance further weakens any claim of economic impact. *See Love Terminal Partners, L.P. v. United States,* 889 F.3d 1331, 1342-43 (Fed. Cir. 2018).

      2.      Plaintiffs Have Failed To Plead That The Eviction Moratorium Interfered With Their Reasonable Investment Backed Expectations

The regulatory takings analysis requires consideration of "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Cent.*, 438 U.S. at 124. No takings claim exists where the restriction "did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant," *Cienega Gardens*, 503 F.3d at 1289 (quoting *Penn Cent.*, 438 U.S. at 125). "It is axiomatic that 'a reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'" *Norman v. United States*, 429 F.3d 1081, 1092 (Fed. Cir. 2005) (quoting *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1005-06 (1984)). "The purpose of consideration of plaintiffs' investment-backed expectations," "is to limit recoveries to property owners who can demonstrate that they 'bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Norman*, 429 F.3d at 1093 (citations omitted).

As a preliminary matter, section 361(a) of the PSHA has existed for over seventy-five years. Therefore, either the CDC lacked the authority to issue the Eviction Moratorium, which

as explained in Section II, precludes takings claims, or the Eviction Moratorium was authorized by a long-standing statute that must factor in to plaintiffs' reasonable investment-backed expectations.  In addition, Plaintiffs are residential landlords and their contractual right to evict tenants from their premises—the right that they claim was affected by the Eviction Moratorium—was already subject to their compliance with state and local landlord-tenant laws in the jurisdictions within which they operate.

Landlord-tenant relations are heavily regulated in most jurisdictions; it therefore cannot be unexpected that a regulation might affect a landlord's ability to pursue an eviction at his preferred time. *See Yee*, 503 U.S. at 528-29; *accord Auracle*, 478 F. Supp. 3d at 222 ("As residential landlords, Plaintiffs' contractual right to collect rent is premised on compliance with a framework of state laws."); *Elmsford*, 469 F. Supp. 3d at 166-68 (same).  Moreover, most residential landlords are already subject to Federal laws, such as the Fair Housing Act, which, among other things, prohibits discrimination in providing rental housing.  *See* 42 U.S.C. §§ 3601-19.  As such, residential landlords' "reasonable investment-backed expectations cannot operate apart from 'public programs adjusting the benefits and burdens of economic life to promote the common good.'" *Auracle*, 478 F. Supp. 3d at 222 (quoting *Penn Cent.*, 438 U.S. at 124); *accord Elmsford*, 469 F. Supp. 3d at 166–68; *but see Baptiste,* 490 F. Supp. 3d at 389–91 (finding for purposes of preliminary injunction motion that state eviction moratorium interfered with reasonable investment-backed expectations, but rejecting regulatory takings claim on other two *Penn Central* factors); *Heights Apartments, LLC*, 510 F. Supp. 3d at 813-14 (same).

Importantly, though plaintiffs seek as just compensation "the fair rental value of the property taken," Compl. at ¶ 39, as previously noted, the Eviction Moratorium did not relieve tenants of their obligation to pay rent and any accumulated late fees and interest.  *See* 85 FR at

35

55,293.  Accordingly, the temporary Eviction Moratorium did not interfere with plaintiffs'

reasonable-investment backed interest in charging rent for the use of their property.  *See Auracle,*

478 F. Supp. 3d at 223 (no interference with reasonable investment-backed expectations where

state temporary eviction moratorium did not preclude landlord from collecting rent and did not

relieve tenants of obligation to pay it).

### 3.    The Character Of The Government Action Weighs Heavily Against Finding A Taking

The final factor, the "character of the government action," also weighs heavily against

finding a taking here.  As the Supreme Court held in *Penn Central*, "[a] 'taking' may more

readily be found when the interference with property can be characterized as a physical invasion

by government . . . than when interference arises from some public program adjusting the

benefits and burdens of economic life to promote the common good."  438 U.S. at 124 (citation

omitted).  As explained in detail above, the Eviction Moratorium involved no physical invasion

of plaintiffs' property.  Instead, it was part of a public program intended to respond to a

pandemic that has already killed more than 750,000 people in the United States.  The CDC found

that because of the economic effects of the pandemic "as many as 30-40 million people in

America could be at risk of eviction" in the absence of a moratorium on evictions.  *See* 85 Fed.

Reg. at 55,295.  The CDC also found that such mass evictions could result in "multiple outcomes

that increase the risk of COVID-19 spread."  *Id.* at 55,294.

Courts have consistently ruled that no regulatory taking occurs when governments adopt

laws designed to protect the public from harm.  *See Maritrans Inc. v. United States*, 342 F.3d

1344, 1357-58 (Fed. Cir. 2003) ("The purpose of the Just Compensation Clause is not to deter

the government from establishing regulations reasonably related to a publicly beneficial policy,

but rather to discourage the government from requiring a few select individuals to bear the burdens of the public benefit." (citing *Pa. Coal Co*., 260 U.S. at 413)); *accord Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1283 (Fed. Cir. 2009) ("[T]he law of regulatory takings does not generally compensate property owners when a regulation's economic impact is slight and temporary but the potential for physical harm to the public is significant.").[11]

C.    Under Supreme Court And Federal Circuit Precedent The Mere Frustration Of A Contractual Expectancy Is Insufficient To Establish A Taking

Plaintiffs allege that though the Eviction Moratorium did not actually relieve tenants of any contractual obligation to pay rent, the CDC's order interfered with their contractual right to collect rent by preventing them from forcibly removing non-paying tenants while it was in effect. *See* Compl. ¶ 25 ("While the CDC Order technically does not relieve tenants from their legal and contractual obligation to pay rent, as a practical matter landlords have little ability to recover past-due rent from delinquent or non-rent paying tenants."). However, "as a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009). "The Supreme Court's decision in *Omnia Commercial Co. v. United States* . . . has long stood for that proposition." *Id*. (citing *Omnia*, 261 U.S. 502 (1923)).

Plaintiffs' claim amounts to an allegation that the Eviction Moratorium—by temporarily restricting their ability to remove tenants forcibly—made it more difficult for them to obtain the

---

[11]    All the arguments as to why plaintiffs have failed to state a physical or regulatory takings claim with respect to the CDC's Eviction Moratorium would apply with at least equal force to any takings claim regarding the extension enacted by Congress in December 2020. Plaintiffs have not pleaded any facts showing that brief 31-day pause on evictions had any effect on their property rights.

contracted performance of rental payments from their tenants.  Yet, under *Omnia*, that does not

constitute a taking for Fifth Amendment purposes.  261 U.S. at 510-11; *accord Huntleigh USA*

*Corp. v. United States*, 525 F.3d 1370, 1380-81 (Fed. Cir. 2008) (holding that Government

action that "frustrated" plaintiff's "business expectations . . . does not form the basis of a

cognizable takings claim") (citing *Omnia*, 261 U.S. at 510).

VI.     Plaintiffs Fail To State Claims For An Illegal Exaction

        The plaintiffs' illegal-exaction claims fare no better than their takings claims.  As the

Federal Circuit has explained, "an illegal exaction claim may be maintained when 'the plaintiff

has paid money over to the Government, directly or in effect, and seeks return of all or part of

that sum' that 'was improperly paid, exacted, or taken from [him] in contravention of the

Constitution, a statute, or a regulation.'"  *Aerolineas Argentinas v. United States*, 77 F.3d 1564,

1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct.

Cl. 1967)).  Thus, a valid illegal-exaction claim must satisfy two elements:  (1) money was taken

by the Government; and (2) in doing so, the Government violated a provision of the Constitution,

a statute, or a regulation.  *Piszel v. United States*, 121 Fed. Cl. 793, 801 (2015), *aff'd*, 833 F.3d

1366 (Fed. Cir. 2016) (citation omitted).  The first prong of this two-part analysis may be shown

where money was paid directly to the Government, or was paid to others at the direction of the

Government to meet a governmental obligation.  *Aerolineas Argentinas*, 77 F.3d at 1573.  "The

essence of an illegal exaction is when 'the government has the citizen's money in its pocket.'"

*Columbus Regional Hosp. v. United States*, 990 F.3d 1330, 1348 (Fed. Cir. 2021) (quoting *Clapp*

*v. United States*, 127 Ct. Cl. 505, 512 (1954)).

        The plaintiffs' illegal-exaction claims fail for at least two reasons.  First, assuming that

the Eviction Moratorium was illegal, plaintiffs' claim is not premised on any payment to the

Government, either direct or indirect.  Plaintiffs do not allege they have made any direct payment to the Government.  Nor have they identified the source of any governmental obligation that they have been required to pay on the Government's behalf.  Instead, plaintiffs' claim is premised on the allegation that "[t]he CDC Order has enriched the Government at Plaintiffs' expense . . . by illegally imposing costs and expenses on Plaintiffs that Plaintiffs should not have to bear and that the Government would otherwise bear, including without limitation the cost of housing delinquent or non-rent paying individuals."  Compl. ¶ 42.  Yet, the United States bears no obligation to pay expenses associated with plaintiffs' private rental agreements.  Plaintiffs' naked assertion that the government has "impos[ed] costs and expenses on Plaintiffs that . . . the Government would otherwise bear," *id*., lacks any factual underpinning and thus does not support a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678 (2009) (explaining that a complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement'" (quoting *Twombly*, 550 U.S. at 557 (2007) (alteration omitted)).  And to the extent plaintiffs allege that they incurred additional cost that *were not* the Government's responsibility to bear, such an allegation does not state an illegal-exaction claim, which must involve payment to the Government or on the Government's behalf.  *Aerolineas Argentinas*, 77 F.3d at 1573.

Second, plaintiffs allege that they "are entitled to recover from the Government the amount of rental income [they] would have received had they been able to lease their property, which is currently occupied under the CDC Order and over their objection by delinquent or non-rent paying individuals, to rent-paying persons at reasonable fair market rents."  Compl. ¶ 43.  This claim—that the CDC has effected an illegal exaction by preventing plaintiffs from receiving rents from *new* tenants following evictions of their existing tenants—is legally untenable.

Plaintiffs admit that the Eviction Moratorium "does not relieve tenants from their legal and contractual obligations to pay rent."  Compl. ¶ 25.  Moreover, both the Federal Circuit and this Court have rejected claims that government action preventing the receipt of monies constitutes an illegal exaction.  *See Piszel,* 833 F.3d at 1382 (government action (as conservator) causing Freddie Mac not to pay plaintiff severance payments was not an illegal exaction); *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (2002) ("The doctrine of illegal exaction requires compensation for actual payments of money and has never, to the court's knowledge, been applied to compensate a plaintiff for lost opportunities to make money.").

In short, the Eviction Moratorium neither required plaintiffs to make any payment to the United States nor required plaintiffs to assume any existing governmental payment obligation. Thus, there can be no illegal exaction where there has been no payment.  *Piszel*, 833 F.3d at 1382 ("No facts as alleged in the complaint concern the payment of money by Mr. Piszel; thus, Mr. Piszel's illegal exaction claim must also fail.").

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the complaint be dismissed.

40

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Christopher J. Carney
CHRISTOPHER J. CARNEY
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:    (202) 305-7597
Facsimile:    (202) 353-0461
Email:        chris.carney@usdoj.gov

NATHANAEL B. YALE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

MARK PACELLA
MATTHEW P. RAND
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice

November 12, 2021                    *Attorneys for Defendant*

41