1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    THE NATIONAL APARTMENT              )

4    ASSOCIATION, et al.,                )

5              Plaintiffs,               )  Case No.

6         vs.                           )  21-1621L

7    UNITED STATES OF AMERICA,           )

8              Defendant.                )

9    --------------------------------)

10

11                        Courtroom 4

12            Howard T. Markey National Courts Building

13                   717 Madison Place, N.W.

14                      Washington, D.C.

15                  Tuesday, April 19, 2022

16                        9:00 a.m.

17                      Oral Argument

18

19

20

21         BEFORE:   THE HONORABLE ARMANDO O. BONILLA

22

23

24

25   Sally Jo Quade, RPR, Reporter

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4            CREIGHTON MAGID, ESQ.

 5            SHAWN LARSEN-BRIGHT, ESQ.

 6            Dorsey & Whitney LLP

 7            1401 New York Avenue, N.W.

 8            Suite 900

 9            Washington, DC 20005

10            (202) 442-3555

11            magid.chip@dorsey.com

12                    and

13            JOHN J. McDERMOTT, ESQ.

14            Law Offices of John McDermott

15            4300 Wilson Boulevard

16            Suite 400

17            Arlington, Virginia 22203

18            (703) 797-0682

19

20

21

22

23

24

25
```

The National Apartment Association, et al. v. USA                                4/19/2022

```
 1   ON BEHALF OF THE DEFENDANT:

 2            NATHANAEL B. YALE, ESQ.

 3            MATTHEW RAND, ESQ.

 4            MARK PACELLA, ESQ.

 5            U.S. Department of Justice

 6            Post Office Box 480

 7            Ben Franklin Station

 8            Washington, DC 20044

 9            (202) 616-0464

10            nathanael.b.yale@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1                    P R O C E E D I N G S
 2                     -    -    -    -    -
 3            (Proceeding called to order, 9:00 a.m.)
 4            CLERK:  The United States Court of Federal Claims
 5    is now in session.  We are here for oral argument in
 6    Case Number 21-1621L, the National Apartment
 7    Association, et al., versus the United States, the
 8    Honorable Armando O. Bonilla presiding.
 9            Madam Court Reporter, are you ready to proceed?
10            MADAM REPORTER:  Yes, I am.
11            CLERK:  Counsel for plaintiff, are you ready to
12    proceed?
13            MR. MAGID:  Yes.  Good morning, Your Honor.  We
14    are ready to proceed.
15            CLERK:  Counsel for defendant, are you ready to
16    proceed?
17            MR. YALE:  Yes, Your Honor.
18            CLERK:  Thank you all.  Judge, we are ready to
19    proceed.
20            THE COURT:  Thank you.  Good morning.  We are
21    here today this morning for oral argument on the
22    government's motion to dismiss plaintiff's complaint for
23    lack of subject matter jurisdiction, or in the
24    alternative, failure to state a claim under which relief
25    can be granted under Rules 12(b)(1) and 12(b)(6) of the
```

The National Apartment Association, et al. v. USA                    4/19/2022

     1    rules of this Court.

     2           Counsel for plaintiffs, if you wouldn't mind

     3    introducing yourselves and your co-counsel, please, or

     4    they can introduce themselves.

     5           MR. MAGID:  All right.  Good morning again, Your

     6    Honor, I am Creighton Magid of Dorsey and Whitney.  With

     7    me is my colleague Shawn Larsen-Bright and also John

     8    McDermott from the Law Offices of John McDermott.

     9           THE COURT:  It's Magid?

    10           MR. MAGID:  Magid, Your Honor you, M A G I D.

    11           THE COURT:  Thank you.

    12           MR. MAGID:  Thank you, Your Honor.

    13           THE COURT:  And who's appearing on behalf of the

    14    United States?

    15           MR. YALE:  Good morning, Your Honor, it's

    16    Nathaniel Yale on behalf of the United States, and I

    17    will also let my co-counsel here introduce themselves.

    18           MR. RAND:  Good morning, Matthew Rand.

    19           MR. PACELLA:  Good morning, Your Honor, Mark

    20    Pacella.

    21           THE COURT:  Good morning.  Before we hear oral

    22    argument on the government's motion, I would like to

    23    share some preliminary thoughts and observations I have

    24    about this case in hopes that it might inform counsel

    25    and focus our areas of argument today.  First I would

The National Apartment Association, et al. v. USA                                    4/19/2022

    1    like to thank counsel for both parties, the government
    2    and the plaintiff, for their extensive briefing.  I
    3    thought it was thorough, it was thoughtful and it was
    4    very helpful to the Court in getting up to speed on this
    5    case that was recently transferred to me.  I want to
    6    apologize on behalf of the Court, I know this was
    7    scheduled for oral argument a month ago, but with the
    8    recent transfer to me, I wanted to make sure that I
    9    wasn't wasting anyone's time and that I was fully
   10    prepared to entertain argument and have a conversation
   11    rather than a monologue by both sides.
   12         Both sides will be given ample opportunity to
   13    make their respective cases on behalf of their clients,
   14    and put their best foot forward on the issues pending
   15    before this Court today.  I understand that plaintiffs'
   16    counsel has an interest in dividing up the oral argument
   17    and you are welcome to alternate depending on the topic
   18    and it doesn't have to be each turn at the lectern, you
   19    are welcome to sit at counsel table and argue or stand
   20    at counsel table and argue or come to the lectern,
   21    however you are most comfortable.
   22         As I stated, I prefer the argument be more of a
   23    conversation than a monologue.  I have a number of
   24    questions.  You should be rest assured that I have read
   25    the briefs multiple times, I have researched the

The National Apartment Association, et al. v. USA                    4/19/2022

    1   governing law and am prepared to ask a fairly

    2   significant number of questions of both sides.

    3           After I share my preliminary thoughts about

    4   certain legal and factual issues, I welcome the parties

    5   to share with me what I have wrong, what I am missing

    6   and what I have that's incorrect.

    7           I would appreciate your candor during these

    8   proceedings; however I ultimately rule on the

    9   government's motion to dismiss, whether I find that

   10   there is a compensable taking under the Fifth Amendment

   11   and/or whether I find that there is an illegal exaction,

   12   which entitles plaintiffs to money damages, I have every

   13   confidence that one or both parties will appeal to the

   14   Federal Circuit.  My job is to make the best factual

   15   record possible and to document my legal analysis in

   16   reaching the Court's results for better review by the

   17   Federal Circuit.

   18           To that end, I will reiterate that I appreciate

   19   your candor and your offer of evidence and your legal

   20   arguments throughout these proceedings.  Turning now to

   21   the more substantive issues.  I have reviewed the

   22   plaintiffs' briefs, the government's briefs, I have

   23   reviewed the actions taken by the President, Congress,

   24   the CDC with regard to the pandemic, with particular

   25   attention focused on the various iterations and

The National Apartment Association, et al. v. USA

1    extensions of the eviction moratoriums.  I have reviewed

2    the CDC's statutory authority under 42 U.S.C. Section

3    264(a), and the various federal court decisions

4    addressing the CDC's eviction moratorium in the D.C.,

5    5th, 6th and 11th Circuits, as well as the Supreme

6    Court's order in the Alabama Association of Realtors.  I

7    have researched the Supreme Court's and the Federal

8    Circuit's precedents on the issue of takings and illegal

9    exactions.

10        On the Fifth Amendment takings issue, I am of the

11    opinion, and that is independent of but reinforced by

12    the decisions of the other circuits and district courts,

13    that the HHS Secretary and in turn the CDC did not and

14    does not have the statutory authority to issue the

15    eviction moratorium which is at the heart of this case.

16    I am, however, interested in hearing argument on whether

17    the President's executive order or Congress's actions

18    through the CARES Act and/or the Covid 19 Relief Act,

19    the Appropriations Bill, constituted in and of

20    themselves a taking or an illegal exaction, or

21    authorized or ratified the CDC's actions in this case in

22    issuing the CDC eviction moratorium.

23        I understand that the Alabama Association of

24    Realtors said no, unequivocally, and that Skyworks in

25    the Northern District of Ohio said no, but I am also

The National Apartment Association, et al. v. USA                    4/19/2022

1   aware of the opinion in Tiger-Lily where the 6th Circuit

2   said that Congress did, in fact, retroactively and

3   prospectively, from at least September 4th of 2020 to

4   January 31st of 2021, authorize the CDC's action in

5   implementing the eviction moratorium.

6          Now to the government, I will assume but will let

7   you clarify when you argue that if I find at the end of

8   the day that the CDC lacked the statutory authority to

9   impose the eviction moratorium, you're inhering and

10  police power arguments are no longer viable.

11         Now I will ask plaintiffs' counsel during their

12  presentation that I would like to hear from you on the

13  issue of standing, the trade association, whether you

14  are asserting an organizational standing or asserting

15  representational standing, and what is the law of this

16  circuit because I have been unable to find a law where

17  the Federal Circuit has allowed representational

18  standing in a takings or an illegal exaction case.

19         With regard to the owners of the residential

20  rental properties, I have read the amended complaint

21  where you identify 38 named plaintiffs and I want you to

22  address whether they are based -- whether they are

23  asserting standing based upon the threat of the CDC

24  moratorium or actually impacted by the CDC eviction

25  moratorium, and we can explore that.

The National Apartment Association, et al. v. USA

1              With that, absent any preliminary questions, I

2       will invite the United States to argue the government's

3       motion to dismiss.  And again, you are welcome to argue

4       from counsel table or at the lectern.

5              MR. YALE:  Thank you, Your Honor, and may it

6       please the Court.  So I will get to the questions that

7       you just put forth.  I wanted to just give a very, very

8       brief introduction as well to our -- to the government's

9       case.  So the CDC issued the eviction moratorium in this

10      case in response to the drastic public health crisis

11      that was presented by Covid 19, a pandemic that's killed

12      almost one million people in this country alone.

13             The eviction moratorium was limited.  It was

14      limited in its duration.  It was limited in terms of the

15      tenants that were covered, and it was limited in terms

16      of its legal effect.  Notably, the eviction moratorium

17      did not excuse the payment of rent.  It only temporarily

18      prevented eviction of tenants when certain requirements

19      were met and when they were unable to pay.

20             So nonetheless, plaintiffs have brought a

21      physical takings claim in this case with respect to that

22      temporary -- the temporary prevention of eviction.  But

23      as we set forth in our motion papers, for a number of

24      reasons, those physical takings claims are deficient.

25             So the primary issue that the Court has already

The National Apartment Association, et al. v. USA

1   alluded to is that plaintiffs cannot establish that the

2   eviction moratorium was authorized by Congress.  So it's

3   well established that to bring a takings claim, to have

4   a takings claim lie, the Congress -- the government

5   action must be duly authorized, either expressly by

6   Congress or by the government official upon whom

7   Congress has conferred that power.

8          THE COURT:  But in this case, the CDC did not

9   just wake up one morning and decide that they were going

10  to issue this eviction moratorium.  Congress had acted

11  first and issued a 120-day moratorium.  Then the CDC,

12  after the President issued an executive order asking

13  them to look as to whether or not there should be

14  another eviction moratorium in place.  So does the

15  executive order do anything to the CDC's authority?

16         MR. YALE:  The executive order does nothing to

17  the CDC's authority because that's -- the executive

18  order was not promulgated by Congress.  What we have to

19  be looking at here is Congress's authority.  And so the

20  fact that President Trump had directed the CDC to look

21  into the issue does not mean that Congress had done

22  that, nor has Congress -- nor did Congress explicitly

23  state or implicitly state that the CDC had the statutory

24  authority to issue the eviction moratorium.

25         And, you know, just one more thing to add about

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1    that, plaintiffs have not argued here that the executive
 2    order somehow provided Congress with the authority or
 3    the authority to support a takings claim.  And backing
 4    up a little bit further in time, with respect to the
 5    question that you asked concerning the CARES Act, I
 6    mean, that's also not at issue here.  I mean, the CARES
 7    Act -- that was only dealing with certain types of
 8    properties, federally backed properties.
 9         THE COURT:  Let me ask you this:  Is -- putting
10    aside the plaintiffs, because I have no idea whether or
11    not any of the plaintiffs had Section 108 housing, but
12    was or could conceivably Congress's act in the CARES Act
13    constitute a taking?
14         MR. YALE:  Well, you know, it's not something
15    that we've considered.  We're not aware that anyone has
16    actually brought a takings claim based upon the CARES
17    Act.  It's my understanding that none of the properties
18    at issue here fell within the CARES Act that was -- you
19    know, obviously with respect to the CARES Act, there
20    wouldn't be this authorization issue, but there's
21    nothing in the complaint with respect to an allegation
22    is that the CARES Act constituted a Fifth Amendment
23    taking or an illegal exaction.  And I think likely,
24    although plaintiffs' counsel can also provide a
25    response, I don't think that these were, you know,
```

The National Apartment Association, et al. v. USA

1    federally backed properties.

2        THE COURT:  Well, with regard to the illegal

3    exaction count, wouldn't you have the same -- wouldn't

4    the government have the same argument that if we talked

5    solely about the Congressional act and the CARES Act and

6    we say that that could have been a takings -- could have

7    been an illegal exaction, would it be an illegal

8    exaction or would you have the same argument that the

9    government didn't take any money or the plaintiffs

10   weren't required to pay any money to the government,

11   whether or not Congress acted or the CDC acted?

12       MR. YALE:  Sure, we would have a lot of this --

13   yes, we would have a lot of the same arguments there.

14       THE COURT:  But your authority argument is gone

15   if Congress acts?

16       MR. YALE:  Well, our argument with respect to the

17   eviction -- and when I say the eviction moratorium, as

18   we've set forth in our briefs, I'm talking about the

19   CDC -- the series of CDC orders.  So the -- those

20   going -- spanning approximately a year.

21       THE COURT:  I'm just trying to assess the extent

22   to which the government will argue that a takings cannot

23   exist under these circumstances, and if the boundaries

24   are Congress by enacting an eviction moratorium, that

25   can, conceivably, constitute a taking.

The National Apartment Association, et al. v. USA

1          MR. YALE:  Sure.  But we obviously have a

2     bunch -- we have other arguments.  So, for example, a

3     lot of this is the key allegation here is a physical

4     takings argument.  So with respect to the physical

5     takings argument, that would apply equally well to, you

6     know, the CARES Act, but, you know, obviously we

7     certainly haven't briefed the -- whether or not

8     there's -- you know, the CARES Act could have set forth

9     a taking.  You know, a lot of the same arguments that we

10    would make, we would make with respect to that.

11          But as to the authority argument, Congress -- you

12    know, Congress imposed that, and I think my initial

13    off-the-cuff response there would be that there would be

14    authority -- Congress had authority to implement and

15    issue the CARES Act because they did so, and it's clear

16    that they did so.  And so that particular argument would

17    not apply equally here.

18          THE COURT:  What about the Congress's December

19    28th, '20 passage of the Covid Relief Act or the

20    Appropriations Bill extending the CDC's eviction

21    moratorium.  Particularly in your brief you note that

22    plaintiffs are not arguing that the 31-day extension,

23    that period of time that Congress authorized the

24    eviction moratorium, constituted a taking.

25          MR. YALE:  Correct.  There is nothing in the

The National Apartment Association, et al. v. USA

```
 1   complaint.  Obviously when the parties have been talking
 2   about the eviction moratorium, it's, as I mentioned
 3   before, this sort of compilation of the various CDC
 4   orders that took place over a year.  And so, you know,
 5   we are setting forth in our brief that there hasn't been
 6   an allegation that that approximate 30-day period, you
 7   know, constitutes sufficient Congressional authorization
 8   for a taking.
 9          The plaintiffs in their briefing were also making
10   the argument that was really advanced throughout the
11   country that -- by the government, that the fact that
12   within the Appropriations Bill there was an extension of
13   the CDC moratorium, that acted to ratify CDC's actions
14   with respect to the preceding orders that had been
15   issued, or that Congress said, essentially acquiesced to
16   that.
17          THE COURT:  I want to get to the ratification
18   argument in just a minute, but I want to just clarify
19   one thing.  The December 2020 Appropriations Bill, that
20   extended the moratorium as-is, so there was no Section
21   108 housing issue in that one, it was the broader
22   eviction moratorium.  Is that right?
23          MR. YALE:  Correct.  It was an extension of what
24   we're calling -- essentially initially the September
25   2020 CDC eviction moratorium.  So that was extending
```

The National Apartment Association, et al. v. USA

1    that by one month.

2              THE COURT:  Right, the month of January 2021?

3              MR. YALE:  Exactly.

4              THE COURT:  And would the government -- in your

5    footnote, you allege or argue that the plaintiffs are

6    not arguing or have not alleged that the 31- or 30-day

7    extension by Congress constituted in and of itself a

8    taking, and if it does, or if they do, then you would

9    have a police power argument in response.  Can you tell

10   me a little bit about that?  Or at least you refer to

11   Section 5 of your brief, and to me that was the police

12   power argument.

13             MR. YALE:  Well, I think that -- and if it was

14   referring to Section 5, that may actually be a mistake.

15   What we were mainly referring to is our physical takings

16   argument.  So even if, you know, there was solely, for

17   that 30-day period, if there was, you know, the mere

18   sort of citation by Congress to the eviction moratorium,

19   which I think the Supreme Court really disposed of

20   whether or not that was ratification or whatnot, whether

21   that could constitute sufficient government

22   authorization for a taking.

23             If that was the case, then there's obviously no

24   regulatory takings claim in this case.  And so our

25   arguments with respect to whether or not there's a

The National Apartment Association, et al. v. USA                                    4/19/2022

 1    physical takings -- taking, that would apply there to

 2    bar there actually being a taking in that case.

 3            THE COURT:  Is it the government's position that

 4    a 30-day is not long enough to be -- a 30-day eviction

 5    moratorium is not long enough to constitute a taking?

 6    Wouldn't that apply in the face of a temporary taking?

 7            MR. YALE:  Well, I mean, I think that there could

 8    be situations where a short period of time could

 9    potentially constitute a taking, but in general, the

10    duration is still -- even with respect to physical

11    takings claims, I mean, the duration is still counted.

12    It's still evaluated in terms of whether something would

13    even fall within the rubric of a physical taking or not.

14            THE COURT:  Well, what about the flyover

15    instance?  Go over someone's air space for seconds if

16    not minutes can constitute a taking.

17            MR. YALE:  Well, yeah, but -- I mean, there are

18    those series of cases, those are the navigation easement

19    cases, but even in those cases, you know, if you

20    happen -- for example, if a helicopter flies over

21    somebody's property two times a year, that doesn't

22    constitute a navigation easement.  That does not

23    constitute a physical taking.

24            And there have been a number of cases, both in

25    this court and in the Federal Circuit, that have held

The National Apartment Association, et al. v. USA                                    4/19/2022

1    that.  So there needs to be, you know, essentially

2    low-level flights frequently over a long period of time.

3    And, for example, the seminal case on that is obviously

4    Cosby, and in that situation, you have a plaintiff's

5    property which is right near an airport.  And so those

6    are low-level, frequent flights that are happening

7    constantly.

8            And so whether, you know, if a situation would

9    happen where there -- for a very brief period of time,

10   there were overflights, we would argue that does not

11   constitute a physical taking in that situation.

12           THE COURT:  Turn to the ratification, if you

13   would.

14           MR. YALE:  Sure.  So with respect to the

15   ratification issue, we think that that particular issue

16   has been addressed by the Supreme Court in the per

17   curiam order in Alabama Association of Realtors.  I

18   mean, that's an argument that the government made to the

19   District Court, to the Court of Appeals, and it's a

20   primary argument that we made to the Supreme Court.

21           And so if Congress had actually ratified the

22   eviction moratorium, I mean, that would have been --

23   they wouldn't have to look into CDC's authority.  And so

24   in that decision, we think that, you know, that has been

25   covered.  And even sort of if it was not, we'll point

The National Apartment Association, et al. v. USA                          4/19/2022

1    back to the fact that in front of the District Court, in

2    D.C., that very same argument was presented to the

3    District Court and it was roundly rejected and it was

4    rejected based on sort of well-established Supreme Court

5    law in terms of what Congress has to do in terms of

6    ratifying -- you know, ratifying an agency's action.

7            THE COURT:  But is there a distinction between

8    ratifying the CDC's overarching statutory authority to

9    do this kind of thing, such as the eviction moratorium,

10   or yesterday's Florida decision regarding the mask

11   mandate, or is it sanctioning this particular action for

12   a specific period of time, such as Tiger-Lily, where the

13   6th Circuit said, Congress didn't come forward and say,

14   you are now forever authorized to issue these broad

15   eviction moratoriums or otherwise for the national

16   health, but for purposes of this eviction moratorium, we

17   are extending the act that you -- that the CDC first

18   supplemented in September through December, we're

19   extending it through to January.  Therefore, Congress is

20   basically saying, from September to January, CDC, you

21   had authority to do that in this one instance?

22           MR. YALE:  Well, I think it would need to be

23   specific, and it wasn't, and we sort of just -- I mean,

24   obviously we presented that argument to the various

25   courts.  We made the argument in good faith, but it was,

The National Apartment Association, et al. v. USA

1    you know, in sort of the seminal case that has gone up

2    to the Supreme Court, that argument was rejected.  And

3    even in the Alabama Association of Realtors case, the

4    Supreme Court pointed at -- used the language that there

5    was no specific -- Congress did not take specific

6    ratification of the moratorium.  I mean, that's at the

7    beginning of that opinion.

8        THE COURT:  So in this particular case, Congress

9    said, we are extending what the CDC has already put in

10   place.  What more would the -- would Congress have to

11   have said for the government to have said, yes, there is

12   ratification here?

13       MR. YALE:  Well, I think they would have had to

14   have made it much more explicit that Congress was

15   accepting the CDC's statutory authority.  But again, and

16   when I'm saying that, I'm referring back to, you know,

17   sort of the District Court's decision in D.C., and the

18   case law that they have cited there.  You know,

19   certainly we made essentially the opposite argument to

20   the District Court, but that was in that litigation it

21   was roundly rejected.

22       And so we don't think that we have the room to

23   make sort of the counterargument there, you know, at

24   this point in time.  And I think just referring to those

25   sort of seminal Supreme Court cases that have talked

The National Apartment Association, et al. v. USA

1    about ratification, you know, it wasn't enough based

2    upon what the District Court held and based upon the

3    Supreme Court's per curiam order.

4         THE COURT:  With regard to unauthorized versus

5    ultra vires actions, as I understand the law, and I

6    understand how the system can and cannot work, if a

7    government official is authorized to do something, they

8    can also act illegally.  That is correct?

9         MR. YALE:  Correct.

10        THE COURT:  And so I bring an example of you have

11   a law enforcement official executing a valid search

12   warrant of a home, goes into the home and decides that

13   they want to look at the car parked in front of the

14   home, which is not part of the warrant.  So you have a

15   law enforcement official duly authorized to execute a

16   search warrant of a house and then goes and executes a

17   car, the search of a car.  That is an authorized act

18   that becomes unlawful, correct?

19        MR. YALE:  Correct.

20        THE COURT:  Do you have an example of -- and I

21   will ask plaintiffs' counsel the same -- of an

22   unauthorized act that can somehow be lawful?  I mean,

23   basically I'm asking the question of I know a square can

24   be a rectangle, but can a rectangle be a square?

25        MR. YALE:  No, Your Honor, and that's sort of the

The National Apartment Association, et al. v. USA

1    cornerstone of our argument here, which is once the

2    Supreme Court says that there's no statutory authority,

3    that's the end of the ball game in terms of the

4    authority issue here.

5         So when you're talking about the sort of flip

6    side to that, getting into sort of cases like Del Rio,

7    what that was really dealing with was a situation where

8    there can be an authorized act, as the example Your

9    Honor gave, but for some reason, there was a legal

10   deficiency.  There was some sort of error in sort of

11   the -- you know, with respect to that authorized act.

12        So if we're talking about an example, you know,

13   with respect to the eviction moratorium, and these are

14   obviously hypothetical examples, but for example, if the

15   Supreme Court found that the eviction moratorium was

16   authorized, but the -- but the CDC did not follow some

17   sort of notice provision or something, and this has come

18   out with respect to other sort of similar cases as well.

19        THE COURT:  Let me ask you this, what if the CDC

20   followed Congress's lead and said -- or didn't follow

21   Congress's lead, that the CDC came out and gave the

22   exact eviction moratorium and the Supreme Court or

23   another court of competent jurisdiction were to say, the

24   act was authorized, Congress, we looked at the statute,

25   if the government had won first round, and that it was

The National Apartment Association, et al. v. USA                4/19/2022

1    an authorization, no issue there, that the CDC was

2    authorized to do it, it's there should have been some

3    sort of federal nexus.  It should have been limited to

4    Section 108 housing.  And here, the CDC went further and

5    said all residential properties.  Could that be an

6    example, if authorized, all of the sudden turns illegal?

7            MR. YALE:  Well, I think that's closer.  That's a

8    slightly different situation obviously.  That's -- but

9    it's so far away from what we have here.  And so

10   obviously, for example, you know, the example I was

11   giving with notice, or with respect -- you know, the

12   eviction moratorium has a punishment mechanism to it.

13           So, for example, if it turns out the Supreme

14   Court weighed in and said, the eviction moratorium, it's

15   authorized under the statute.  They went through the

16   statutory analysis, but then they said, you know what,

17   the punishment there that was put forth, that has

18   serious problems with respect to the 8th Amendment.

19   Something along those lines where the actual action

20   itself is authorized, but there's some other legal

21   deficiency.

22           That's really what Del Rio was getting at, where

23   in that case, the government had the authority to issue

24   a permit, deny a permit.  It had the authority to

25   regulate that specific mining.  But whether or not they

The National Apartment Association, et al. v. USA

1   got some sort of specific requirement wrong, that's far,

2   far different from looking at the situation of whether

3   the agency has the power to act in the first place.  And

4   when the agency doesn't have the power to act in the

5   first place, that's when it's unauthorized, and

6   that's -- that's where there cannot be a takings claim.

7   And we that I think that that goes all the way back to

8   the long -- you know, long line of cases from Hooe to

9   Youngstown Tube and Steel, and we think that's been

10  consistent throughout.

11          And even after Del Rio when you look at the cases

12  that arguably are the most analogous, where the Supreme

13  Court in the cigarette vending machine cases, where the

14  Supreme Court has weighed in and said, there's no

15  statutory authority there.

16          THE COURT:  Well, in those cases, you have an

17  affirmative statement by Congress that thou shalt not do

18  this and they tried it anyway.  Here you have Congress

19  saying, we're going to extend what you did.

20          MR. YALE:  Well, again, Congress -- Congress was

21  not saying -- you know, was not sort of blessing

22  overall, in terms of ratification or anything like that,

23  the eviction moratorium.  But again, as sort of even

24  those cases -- the cigarette vending machine cases made

25  clear, you know, A-1 Amusement and A-1 Cigarette, it's

The National Apartment Association, et al. v. USA

1    not just the fact that there was this statement where

2    Congress -- I mean, that's additional evidence that it

3    was really, really unauthorized, and that made it very,

4    very clear, but what we have here is very similar

5    because we have the Supreme Court of the United States

6    weighing in and saying, it's unauthorized.  It's

7    virtually certain that this is unauthorized and using

8    language that it strains credulity that, you know,

9    basically the government's view of the statutory

10   authority is correct.

11          And so we think that those are really analogous

12   cases that really get to the fundamental point and the

13   other cases which get to the example that you were

14   mentioning where there really is an authorized action

15   with respect to the taking, but there's some illegality

16   involved there.  That's a completely separate issue that

17   we do not have here.

18          THE COURT:  I want to touch on the Yee case that

19   the government relies on.  For me, looking at the fact

20   that their eviction was an option in that case and there

21   isn't here, I don't know how to square those two.

22          MR. YALE:  So the way to square it, I think, is

23   the basic distinguishing characteristic that is the same

24   in Yee is the fact that there was an initial

25   relationship.  You know, that the comparison case that

The National Apartment Association, et al. v. USA

1    plaintiffs have set forth is Cedar Point.  In Cedar

2    Point, what we're -- what the Court was faced with were

3    these union organizers who were complete strangers.

4    That's not the situation we have here.  What we have

5    here is an ongoing relationship.

6         Plaintiffs have invited -- in Yee, plaintiffs

7    invited those mobile home owners onto their property.

8    They entered into a landlord/tenant relationship.  And

9    once that relationship exists, there can be regulations.

10   There can be restrictions put in place.  But -- and

11   that's the same situation we have here.  These aren't --

12        THE COURT:  Well, it isn't, because there,

13   eviction was still on the table, and there, you had a

14   state regulating and the states have a lot more

15   authority to regulate landlord/tenant issues than the

16   Federal Government does.

17        MR. YALE:  Well, I'll take those sort of in turn.

18   Yee makes clear in its decision that it's not simply a

19   rent control decision.  It's not simply, you know, as

20   plaintiffs have tried to argue, that that's really a

21   rent control decision.

22        In Yee, it was the combination of rent control

23   plus the fact that the California state law had made it

24   very onerous to evict those individuals.  For example,

25   if you -- if the plaintiffs there wanted to get their

The National Apartment Association, et al. v. USA

```
 1    property back, they had to go and provide six or 12
 2    months' notice.  And that's what's getting to the
 3    argument of the right to exclude.  And so in both Yee
 4    and this case, there are situations where, you know, the
 5    landlords can evict.
 6         So, for example, in both, there can be evictions
 7    for not following the rules and whatnot, but what the
 8    plaintiffs in Yee were arguing was it was not simply
 9    about rent control, it was that they can't choose their
10    tenants.  They can't -- because of the onerous process
11    for eviction, they can't -- they're losing the right to
12    exclude.
13         And that's the most factually similar case to
14    what we have here in terms of Supreme Court precedent.
15    It's quite simply not Cedar Point.  Cedar Point had to
16    do with strangers who had no right at all, ever, to be
17    on the property.  Those union organizers.  Here, it's a
18    different situation because the individuals, the tenants
19    at issue here, were invited in the first place.  And
20    once that happens, there can be regulation of that
21    relationship.  There can be restrictions put in place.
22         So, for example, there could be -- you know, the
23    state could come forth and say that you need to provide
24    this length of time of notice before an individual can
25    actually be evicted.  I mean, those are regulations that
```

The National Apartment Association, et al. v. USA

 1    can be imposed and it's not that -- and that's not
 2    necessarily answering the takings question.  What that's
 3    getting to is whether or not we're viewing this under
 4    the rubric of a physical taking or a regulatory taking.
 5         So once that relationship happens, it goes to --
 6    it goes to the regulatory takings rubric.
 7         THE COURT:  But in Yee, the tenants continued to
 8    pay their rent, reduced rate, but they continued to pay
 9    their rent.  Here the allegation is that with the
10    government's blessing, the tenants stopped paying the
11    rent.  So the invitation to come on the property was no
12    longer there, or wanted to be forfeited.
13         MR. YALE:  Well, in Yee, the invitation was no
14    longer still there as well because they didn't -- they
15    didn't want to continue to rent to these people.  They
16    didn't want to continue to rent to these folks at a
17    lower rent.  They wanted to be able to transfer the
18    property to somebody else to pay a higher rent, but they
19    were unable to do so, and that's based upon the
20    state's -- the rules that were put in place by the
21    state.
22         THE COURT:  But wasn't the rub there that the
23    property owners were upset that the existing tenants,
24    the mobile home owners, could then profit more because
25    of the reduction in rent?  So that the delta from when

The National Apartment Association, et al. v. USA

1    they purchased to where there was a reduction, they

2    could make more to a prospective buyer, but in that

3    case, in Yee, again, there was relief.  The owners of

4    the property could evict.

5         Now, yes, there was an extended notice period,

6    but my understanding in the real estate world is that

7    any eviction does not happen, and I'm going to ask

8    plaintiffs' counsel about this, it's not as if you don't

9    pay rent on September 1st, September 2nd, I evict you,

10   and on September 2nd in the afternoon you have a new

11   rent-paying tenant.  It does take its time to work its

12   way through the courts.

13        MR. YALE:  Correct, which it's that -- but that

14   doesn't -- that detracts from plaintiffs' argument

15   because you have those restrictions, the restrictions

16   that you were just talking about that it has to work

17   through the court system.  There can be system rules put

18   in place so that you -- so if somebody misses rent for

19   one day, they're not just out on the street, even though

20   plaintiff, the landlords, may want them to immediately

21   be cast out.

22        I mean, if -- I think a simple way to put it is,

23   if that's really the view of Yee and Cedar Point, then

24   immediately any time an individual doesn't pay rent,

25   they've essentially -- and the state allows that

The National Apartment Association, et al. v. USA

1    individual, that tenant, to stay, based upon reasonable

2    restrictions, that's a physical taking, because that --

3    you can't separate out even just like the rent control

4    cases for that situation.

5        And so, you know, I will note that, you know,

6    there are a number of other district courts who have

7    supported our view of the distinction between Yee and

8    Cedar Point.  I would like to mention that there was --

9    it came to our attention that the 8th Circuit did

10   reverse the Minnesota District Court case within the

11   last -- I want to say within the last 10 days or two

12   weeks, and just for sort of the interest of full

13   disclosure, I have a copy of that decision and I could

14   hand it out.

15       We disagree with the reasoning there for exactly

16   the reasons we were just talking about.  We've, I think,

17   listed in our briefs, five or six district courts who

18   have based their analysis on Yee, but it just recently,

19   very recently, came to our attention that the 8th

20   Circuit issued a decision there and so we just wanted

21   to, you know, provide that as well.

22       THE COURT:  Thank you.

23       MR. YALE:  I'm happy to -- I know there's these

24   Covid rules about handing out paper or not, but I would

25   be happy to provide you with a copy and provide it to

The National Apartment Association, et al. v. USA

 1    plaintiffs's counsel as well.

 2            THE COURT:  That would be great.  Thank you,

 3    counsel.

 4            MR. YALE:  Sure.

 5            THE COURT:  Any thoughts on my initial statements

 6    about your inhering argument and state police powers if

 7    the court, in fact, finds that the act of the CDC was

 8    unauthorized and/or -- and not ratified?

 9            MR. YALE:  Well, so yes.  I mean, if it's --

10    particularly with respect to the inhering the title

11    argument, I mean, if it's unauthorized, I think there's

12    -- those two arguments cannot stay together, and so I

13    think we deem that sort of like the background

14    principles argument.  That argument would not succeed

15    if, as we argued, there was a lack of authority.

16            THE COURT:  Okay.  I would like to hear you on

17    illegal exaction.

18            MR. YALE:  Sure.  Well, so with respect to

19    illegal exaction, we think it's dispositive that there

20    really has been no payment in this case.  And so there

21    does not need to be a direct payment to the government.

22    There can be a payment to a direct -- to a third party,

23    and that's the Aerolineas case, but there has not

24    been -- we are not aware of any cases in the Federal

25    Circuit or this Court where there has been an illegal

The National Apartment Association, et al. v. USA

1    exaction found and there hasn't been a payment.

2         For example, we cited the Piszel decision, who

3    had the really unambiguous statement that where there's

4    no payment, there can be no illegal exaction.  And I

5    think that part of the underlying rationale there is,

6    this is a court of limited jurisdiction under the Tucker

7    Act.  And so if there has been -- if the money is not in

8    the government's pocket or the government has not

9    required the money to be placed into a third party's

10   pocket, based upon the actions of the government, there

11   is no room for an illegal exaction case under that

12   particular construct.

13        THE COURT:  Let me ask you this:  If the CDC

14   issued the eviction moratorium, as they did, and one of

15   the plaintiffs nevertheless evicted someone during the

16   pendency of the eviction moratorium, who had submitted

17   the required declaration under penalty of perjury that

18   they met the Covid restriction requirements, and they

19   were nevertheless physically removed from the property

20   after an eviction, and either the CDC or the Department

21   of Justice imposed a civil or a criminal penalty and

22   then the Supreme Court or another court of competent

23   jurisdiction, or this Court, ultimately decided that

24   there was no authority to issue the eviction moratorium.

25   Would that case bring you an eviction or an illegal

The National Apartment Association, et al. v. USA                                    4/19/2022

 1    exaction?

 2         MR. YALE:  If there was actually payments made

 3    based upon an illegal -- the application of illegal

 4    statute, I think that's a different situation, but that

 5    fits within the rubric and the construct of this Court's

 6    jurisdiction here.  Otherwise, all that -- without that,

 7    what you essentially have is an APA case.  You just have

 8    an APA claim where there's arbitrary or -- arbitrary

 9    action by the agency or some sort of illegal conduct,

10    and you're saying there's damages.

11         THE COURT:  So is it the government's position

12    that the plaintiffs in this case, similar to the

13    plaintiffs in all the cases that challenged in District

14    Court the eviction moratorium, have received the relief

15    that they are entitled to, which is the eviction

16    moratorium is no more?

17         MR. YALE:  I'm not sure I followed that.  Could

18    you repeat that?

19         THE COURT:  Yes.  So there were a number of

20    District Court litigations and the representatives of

21    the CDC arguing that the eviction moratorium -- they

22    wanted declaratory and injunctive relief, and they got

23    it.  Is it the government's position that the plaintiffs

24    in this case are entitled to no more than the

25    declaratory and injunctive relief already received in

The National Apartment Association, et al. v. USA

1    the District Court litigation that the CDC didn't have

2    the authority to issue this eviction moratorium and the

3    eviction moratorium is no more?

4         MR. YALE:  Well, so they still -- they obviously

5    still have the remedy in state court or local court to

6    go in, because they had leases with these tenants, and

7    so they still have that particular remedy.  But the fact

8    that, you know, an agency may take action, and that may

9    not lead to a claim in the Court of Federal Claims, I

10   mean, that's -- it's a court of limited jurisdiction,

11   and so there has to be a jurisdictional hook there.

12        And so there's both the fact that when the

13   eviction moratorium was issued, you can go to the

14   District Court, you can get injunctive relief.  In this

15   particular case, they still have the ability to sue in

16   state court with respect to anyone who, you know, didn't

17   pay the rent.  And so those are the remedies that they

18   have.

19        THE COURT:  Right, but I was speaking to the

20   remedies against the Federal Government, that their sole

21   recourse, and the government's position, is to

22   invalidate the eviction moratorium.  It is not to seek a

23   takings damage.  It is not to seek an illegal exaction.

24   It is not to seek an excessive fine or anything within

25   this Court's jurisdiction or any monetary damages

The National Apartment Association, et al. v. USA

```
 1    outside of this Court's jurisdiction against the United
 2    States.
 3          Now, there are individual -- if plaintiffs -- if
 4    the CDC was clear, as was Congress, originally, Congress
 5    said, in the CARES Act, could not tack on late fees.
 6    The CDC said you can.  So all the available remedies
 7    against the tenants are still available, they just don't
 8    involve the Federal Government?
 9          MR. YALE:  Well, that's correct.  And, you know,
10    whether or not there's some other remedy against the
11    United States that doesn't involve this case and the
12    claims here may be a different story.  I can't think of
13    one.  I wouldn't think that they would have such a
14    remedy.  And part of that is, when there's an
15    unauthorized agency action, the remedy is an
16    injunctive -- I mean, it's injunctive relief, which
17    eventually was granted by the courts.  And so we think
18    that that's the remedy -- that's all that they would be
19    entitled to.
20          THE COURT:  And I have one more question about
21    whether this should be a motion to dismiss for lack of
22    jurisdiction or failure to state a claim.  Because I
23    know that there is at least one Federal Circuit decision
24    that suggested that jurisdiction is the way to go, but
25    the rest of them are quite clear that because we're
```

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1    arguing about the merits of the authority rather than
 2    simply saying the plaintiff has stated any form of a
 3    taking or an illegal exaction, that this case is better
 4    dealt with, if it is to be dismissed, based upon the
 5    complaint, that it would be a failure to state a claim?
 6          MR. YALE:  Sure.  I guess I'll -- just to first
 7    address that.  I think the cases both within this Court
 8    and the Federal Circuit have been somewhat inconsistent
 9    about whether it's really a jurisdictional dismissal or
10    not.  I think Judge Solomson within the last year had a
11    decision that sort of cited to a number of the decisions
12    that went back and forth.  For example, Lion Raisins is
13    sort of going one way, I think the Campbell decision in
14    the Federal Circuit is going another way.
15          You know, so I'm not sure that it would make a
16    material difference to our argument.  I understand that
17    you would want to dismiss it in a way that would be
18    consistent with the applicable precedent.  We think
19    probably the more of the cases have found that it's a
20    12(b)(6) dismissal.  In our motion, we also made -- we
21    also argued that it could be a jurisdictional dismissal
22    partly because there are these cases that have sort of
23    stated that it's really a jurisdictional dismissal.
24          And I think what those cases are getting at is
25    more that it's not really a takings claim in that sense,
```

The National Apartment Association, et al. v. USA

1   a claim that falls within the court's jurisdiction, it's

2   really something else.  It's, you know, sort of more

3   getting towards an APA -- should have been brought as an

4   APA claim or the like, but we probably think it would --

5   you know, a dismissal on 12(b)(6) would make sense.

6          THE COURT:  Anything else, counsel, before I hear

7   from plaintiffs' counsel?

8          MR. YALE:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you.

10          MR. MAGID:  Good morning, Your Honor.  As the

11   Court indicated and as we had informed the Court, our

12   intention is to divide the argument.  Mr. Larsen-Bright

13   gets all of the hard arguments and, you know, I get to

14   do the rest.  I am joking, of course, but my intent is

15   to address the Yee versus Cedar Point Nursery and

16   Alabama Realtors distinction, as well as the illegal

17   exaction arguments.  Mr. Larsen-Bright is prepared to

18   argue the authority, police power and hearing arguments

19   as such.

20          And so I don't know if the Court has a preference

21   as to which of us you hear from first.

22          THE COURT:  The only thing I'm asking is who will

23   address standing?

24          MR. MAGID:  I guess I will go ahead and address

25   standing.

The National Apartment Association, et al. v. USA                    4/19/2022

```
 1              THE COURT:  Okay.  Then you can go in any
 2     order -- but before you sit down, I want to talk about
 3     standing.
 4              MR. MAGID:  Okay, and you will remind me, okay,
 5     if I don't get to it?
 6              THE COURT:  Yes.
 7              MR. MAGID:  That's great.  Your Honor, before we
 8     get into kind of the nuts and bolts, I think it's
 9     important to kind of step back a bit.  Your Honor is
10     well aware of the language of the Fifth Amendment.  It
11     does not limit actions for takings where the
12     government's obligation to pay just compensation to
13     actions that, "have adjudged to have been within
14     authority."  However, it says simply, "nor shall public
15     property be taken for public use without just
16     compensation."
17              In listening to Mr. Yale, it's interesting to
18     think about what the government's position is in this
19     case, and that is a taking can exist, if the government
20     takes legitimate action, that is duly authorized, it has
21     an obligation to pay.  But the government can take
22     action enforced by, as in this case, threat of jail,
23     threat of significant finding, so nobody is going to
24     buck that, and at the same time say, well, if it
25     turns -- you know, if we want to avoid paying just
```

The National Apartment Association, et al. v. USA                                    4/19/2022

 1    compensation, we merely have to find a rationale for
 2    saying suppose it's truly authorized.
 3            So you have a regime in which a lawful government
 4    has to pay compensation, but a government acting outside
 5    its lawful authority can evade any obligation to pay for
 6    a taking.
 7            THE COURT:  Well, the argument is, and I think
 8    the Federal Circuit precedent is clear, that if the
 9    government is acting without authority, or someone
10    within the government is acting without authority, how
11    can you hold the government liable for that action under
12    a takings claim?  Because the government is not, in
13    fact, taking, if the act was unauthorized or unlawful.
14            MR. MAGID:  Precisely, Your Honor, and again,
15    Mr. Larsen-Bright will go into this in more detail, but
16    that I think is the essence.  If you have a government
17    actor who is told you only have authority to enter into
18    a lease of this building and he goes and leases the
19    entire city block or something, and that's outside that
20    mandate, yeah, then the government can't be held on
21    that.
22            But here, you have the CDC acting on an
23    implementing regulation that is under a Congressional
24    statute that Congress later extends, and to say that
25    notwithstanding the fact that the Supreme Court later

The National Apartment Association, et al. v. USA                    4/19/2022

1    said we think you got out over your skis, to say that

2    there can be no takings case here, because it wasn't

3    "authorized," that really does beg credulity.

4         This is a case in which the very essence of the

5    government, the Executive Branch, the Congressional

6    Branch, are trying to, as the government says, in

7    extensive terms in its brief, you know, addressing a

8    public health emergency.  And it is carrying this out

9    under the banner of the government, believing that it

10   has that authority, and to say now that in that case

11   that there is, despite the fact that there has been

12   private property appropriated, that there is no taking,

13   it's just very hard to square with the Constitution and

14   the notion of limited government power and the notion

15   that the government does have to pay just compensation

16   when it appropriates private property for a public

17   purpose, which this clearly was.

18        So I would like to talk a little bit, maybe just

19   a couple of housekeeping things since Your Honor had

20   asked about organizational and representational

21   standing.  We had earlier informed the Court before Your

22   Honor became involved in the case that the National

23   Apartment Association was withdrawing as a plaintiff.

24        THE COURT:  Okay.

25        MR. MAGID:  And so this case involves as

The National Apartment Association, et al. v. USA

 1    plaintiffs individual property owners.  We will at some
 2    point seek to amend our complaint to add additional
 3    property owners, but the apartment association itself is
 4    not the -- the government provided us authority and we
 5    agreed with the government that it did not make sense to
 6    pursue a claim on behalf of the National Apartment
 7    Association.
 8         THE COURT:  Okay.  And if this is a good time to
 9    talk about the 38 plaintiffs you currently have, I have
10    a few questions there.
11         MR. MAGID:  Okay.
12         THE COURT:  And so in the complaint, the First
13    Amendment -- first amended complaint, it is my
14    understanding that you have identified them by the total
15    number of units that they currently own, as opposed to
16    the total number of units that were impacted by the CDC
17    moratorium.  I'm assuming, but I want to make sure, that
18    if I -- and you list them as having between one and over
19    3,000 pieces of property, whether they're apartments or
20    a home.
21         MR. MAGID:  Right.
22         THE COURT:  And so there is no allegation in the
23    complaint, as far as I can tell, that the -- any of the
24    tenants were in arrears, were the subject or going to be
25    evicted, and weren't because they filed with the land

The National Apartment Association, et al. v. USA                    4/19/2022

1    owner or the property owner the required CDC declaration

2    and the land owner started and initiated actions to

3    evict but stopped short of physically removing them.

4    And that but for the eviction moratorium, a particular

5    plaintiff or plaintiffs would have, in fact, evicted the

6    tenants.

7            MR. MAGID:  What we allege is that each and every

8    one of those 38 plaintiffs had tenants who would have

9    been subject to eviction proceedings who were not

10   evicted because of the CDC moratorium and therefore

11   those property owners suffered damages.

12           THE COURT:  Well, as I read the complaint, it

13   lists all 38 and it says, this property owner owned one

14   home, this property owner owned 1,100 units, apartment

15   buildings, but there is no connection of I would have

16   evicted this person or I started down the road of

17   evicting, but stopped, or I went all the way until the

18   physical removal and asking the marshal or the local

19   constable to remove them because of the CDC moratorium,

20   nor is there any allegation, as far as I could tell,

21   please correct me if I'm wrong, that any of the tenants

22   submitted the CDC declaration.

23           MR. MAGID:  Right.  Your Honor is correct that

24   that level of detail on an individual tenant by tenant,

25   apartment by apartment basis, is not in the complaint,

1    following notice pleading, we have pled that each and

2    every one of those apartment owners has been damaged

3    because of moratorium, and the only way that they can be

4    damaged is if they had tenants who they would have

5    evicted and would show in a damages phase they would

6    have evicted, but for the moratorium, and would show

7    what their losses are accordingly.

8         Your Honor is correct that in describing the

9    types of properties for Court, we did not go through and

10   say, of the 2,000, 471 were impacted by this.  That is a

11   question that if we proceed as we hope to do, with this

12   case, then that very much becomes a question of damages

13   on an individual basis, but to go and get into that

14   level of detail prior to the broader picture, you know,

15   seemed contrary to the basic essence of notice pleading.

16        THE COURT:  And I'm not suggesting that you were

17   required in filing your original complaint to go into

18   that level of detail, what I am suggesting to you is I

19   want to make sure going forward that all of your clients

20   are on notice that if I own a home and took no steps and

21   just sat back and let the CDC moratorium exist and then

22   I'm going to claim that I have been harmed and am

23   entitled to either double rent or back rent, that is not

24   going to fly in this Court.

25        MR. MAGID:  Right.  And totally understand.  We

The National Apartment Association, et al. v. USA                                    4/19/2022

 1   have vetted the plaintiffs we have.  I can tell the
 2   Court that there were many more interested parties and
 3   some we just had to say, based on your facts, we don't
 4   think the shoe fits, but we fully understand that we
 5   would have to prove up impact and the necessary
 6   requirements to secure damages.
 7            THE COURT:  And along those lines, if we do get
 8   to the issue of damages, I want to make sure that as I
 9   alluded to earlier, it is not going to be a lost profits
10   analysis or a plaintiff's tenant failed to pay rent on
11   September 1st through December, then you are
12   automatically entitled to those four or five months of
13   rent, back rent, as if plaintiff didn't pay on September
14   1st, was evicted on September 2nd, you got a new tenant
15   on September 2nd, and they were a full and fair-paying
16   tenant.  The Court cannot make the plaintiffs better off
17   than they would have been.
18            My understanding, too, is depending on state
19   jurisdiction, eviction proceedings can take months if
20   not over a year.  I know in the District of Columbia it
21   is particularly difficult to evict tenants for
22   nonpayment of rent, and to make sure that we will be
23   inquiring as to the plaintiffs whether or not -- whether
24   they took steps or not to initiate eviction proceedings,
25   and stopped short of or just sat back and waited.

The National Apartment Association, et al. v. USA

 1          MR. MAGID:  Right, and I appreciate the Court's

 2     guidance on that.  Yes, and as the case goes forward, we

 3     very much intend to get into the details and we

 4     understand that the mere fact that somebody doesn't pay

 5     rent on the first of the month doesn't mean that damages

 6     accrue right after the stroke of midnight.

 7          THE COURT:  Yeah.  And I also have a question on

 8     damages.  Whether any of your clients availed themselves

 9     of the $50 billion that Congress set aside for back rent

10     or emergency rent.

11          MR. MAGID:  I am not aware that any did, but

12     again, that would be something that I think we would

13     look into in the next phase.

14          THE COURT:  All right, thank you.

15          MR. MAGID:  If I could talk a little bit about

16     Yee versus Cedar Point, I think there are a couple of

17     things that are important about Cedar Point.  In Cedar

18     Point, the Supreme Court made it clear and there had

19     been a lot of confusing case law from the Supreme Court

20     in terms of using language such as a permanent taking or

21     a temporary taking, whatever.

22          The Supreme Court made it clear that duration was

23     not an issue.  It said that -- and it really emphasized

24     the right to exclude, and it had language that I can't

25     do justice to, going on in great detail about how this

The National Apartment Association, et al. v. USA

1    is the essence of property rights, and this is not just

2    a stick in the bundle of rights, but this is the whole

3    group of sticks all bound up in the right to exclude.

4    It said that the right -- that the duration of any

5    preparation of that right doesn't matter, it doesn't

6    matter whether it's temporary or permanent, it doesn't

7    matter whether it's continuous or intermittent, and it

8    says it also doesn't matter whether that right to

9    exclude has been appropriated through regulatory action

10   or statute or ordinance.

11          And then a few months later, court came back in

12   the Alabama Realtors case and in that per curiam opinion

13   said that landlords subject to the very moratorium that

14   we are talking about today are subject to a moratorium

15   that "is preventing them from evicting tenants who

16   breach their leases intrudes on one of the most

17   fundamental elements of property ownership, the right to

18   exclude."

19          That's critically important.  The Supreme Court

20   has said that exactly what the government has done

21   through this moratorium is to impinge on and appropriate

22   the right to exclude.  The very right that the Supreme

23   Court in Cedar Point said is a fundamental right that

24   is -- gives rise to a per se taking.

25          And that's exactly what we have here.  The Court

The National Apartment Association, et al. v. USA                                                4/19/2022

```
 1    was exactly right.  We have tenants who were in breach
 2    of their agreements, because they didn't pay rent.  They
 3    are no longer, as the government seeks to maintain,
 4    invitees, and we'll talk about Yee in a moment, but the
 5    whole crux of the government's argument is, once you
 6    invite somebody, they're invitees for perpetuity, and
 7    that just isn't the case.
 8         If this were an issue in which you had
 9    rent-paying tenants who were lawfully on the premises,
10    they hadn't lit a fire, they weren't selling drugs,
11    whatever else, they're entitled to be there, then the
12    law is pretty clear, you can have certain types of
13    regulations.  You can prohibit property owners from
14    discriminating against certain people who apply to rent
15    an apartment.
16         You can have rent control.  You can have things
17    of that nature.  But there is nothing that says that
18    once that relationship ends, once the tenant is no
19    longer in good standing, is no longer an invitee,
20    because that tenant is not in compliance with the terms
21    of the rental agreement, that you're stuck with that
22    tenant for life, and that's what the court again
23    emphasizes in the Alabama Association of Realtors case.
24         THE COURT:  And what about the distinction
25    between the state's ability to regulate the
```

The National Apartment Association, et al. v. USA

 1    landlord/tenant versus the Federal Government's?

 2         MR. MAGID:  Right, and I think Your Honor

 3    mentioned this in speaking with Mr. Yale, and I think

 4    Your Honor is correct, that the states, because of their

 5    police power and authority, are given a little bit more

 6    leeway in terms of regulating, for example, rent

 7    control.  The states, as Your Honor has just pointed

 8    out, can implement certain restrictions that have to do

 9    with the notice that you have to provide to a tenant

10    that they're -- they have not paid their rent on time.

11    And various states have enacted that and we are not

12    challenging any of that.

13         What we are challenging is the notion that you

14    can have a blanket moratorium that precludes taking any

15    action to evict non-rent-paying tenants, in essence for

16    the duration of this moratorium, those former

17    invitees --

18         THE COURT:  But unlike Congress in the CARES Act,

19    the CDC did not abdicate responsibility for paying rent

20    or late fees.

21         MR. MAGID:  Sure.  It said we're not doing that,

22    but the practical effect is that that money is gone.  I

23    mean, keep in mind --

24         THE COURT:  The right to collect is distinct from

25    the collectability of that right?

The National Apartment Association, et al. v. USA                          4/19/2022

1        MR. MAGID:  Well, in a very technical sense it
2    might be, but essentially from a property right
3    perspective, it's very small consolation to the property
4    owners that say, you can't take any action to collect
5    and then months or years later you can go and try to
6    collect that money.
7        Keep in mind, the tenants who are subject to this
8    are not people who are living in $14 million, you know,
9    rental homes in Manhattan.  These are people of more
10   limited means.  They are people who if they don't pay
11   their rent, and -- and the Federal Government knows this
12   and that as debts become aged, they become much, much
13   harder to collect.
14       The Treasury Department noted last year that the
15   Federal Government has over $200 billion in non-tax
16   delinquent debt that it's finding very difficult to
17   collect because, you know, if you collect it -- if you
18   try to collect it a week after it's due or two weeks
19   after it's due or three weeks, you might have a decent
20   shot, but asking someone to try to collect from people
21   who are subject to this ordinance or subject to the
22   moratorium, the very people who have lost their jobs,
23   who don't have an income, to say, okay, now you're, you
24   know, a year or whatever it may be of back rent, write a
25   check, you know, that's really magical thinking.

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1           THE COURT:  So I assume that it's the plaintiffs'
 2    position that a default judgment that is uncollectible
 3    is meaningless?
 4           MR. MAGID:  Yeah.
 5           THE COURT:  But there is a distinction here, if
 6    the government had said you are required to allow your
 7    tenants to stay, whether or not they can pay rent, and
 8    you are not allowed to go after them, and that was an
 9    authorized act, that would be a taking?
10           MR. MAGID:  Absolutely.
11           THE COURT:  Does it differ because in this case
12    you still had the collectability route, even if it was
13    ultimately deemed uncollectable?
14           MR. MAGID:  No, it doesn't.  It's -- I understand
15    the distinction that the Court raises, but from a
16    takings perspective, it doesn't make any difference at
17    all, because on the one hand, you said -- as Your Honor
18    correctly stated, you have a clear-cut takings case.  In
19    the other one, you merely have this wrinkle that creates
20    an illusory opportunity to go chase something at the
21    end, but it doesn't really exist.
22           So, again, this gets more into the damages issue.
23    Presumably the government would say, well, you know,
24    what did you do to collect or whatever else, and we'll
25    have an expert that says, maybe you could have collected
```

The National Apartment Association, et al. v. USA

1    15 cents on the dollar or whatever they're going to say,

2    but that doesn't change the takings analysis, which is

3    that -- the ability to, you know, not only collect

4    rents, but when it's clear that someone is not going to

5    be able to pay that, to move them out and bring in a

6    rent-paying tenant, that is lost forever.

7         The fact that you might be able to pursue -- you

8    know, try to squeeze blood from a turnip is an

9    interesting wrinkle, but it doesn't make a difference

10   from the takings analysis.

11        THE COURT:  And you raise another issue, again,

12   it goes to the issue of damages, but I just want to put

13   it on your radar, is that the plaintiffs will have to

14   show that there were, in fact, during the middle of this

15   pandemic, available tenants ready, willing and able to

16   move in.

17        So if you owned an apartment building that had

18   3,000 units and 600 were sitting vacant for months, it's

19   not as if one unit were to be vacated because of a

20   nonpayment of rent you would automatically get someone

21   to move into that particular place.

22        I really want to forewarn you of what's to come

23   and because -- and the reason I'm alerting you to this,

24   it's -- in the complaint, there is a statement about,

25   you know, Court and Congress estimates that this is a

The National Apartment Association, et al. v. USA

1    $50 billion issue, and I don't want the plaintiffs to

2    think that this is somehow going to be a 50 million --

3    billion dollar judgment, if we get there.

4           MR. MAGID:  Right, and understood and appreciate,

5    again, the foreshadowing from the Court, if that's the

6    right term to use.  But no, we have thought about this,

7    we understand this, and again, I assure the Court that

8    we're not coming up with a very simplistic damages

9    theory of we have these -- this number of units and

10   we're going to multiply it by, you know, the number of

11   months that the moratorium was in effect and divide that

12   into, you know, $50 billion or something.

13          THE COURT:  And so I asked government counsel and

14   I'll ask you whether or not the plaintiffs are arguing

15   that either the CARES Act, standing alone, or the

16   Appropriations Act in December of 2020, for Covid

17   relief, standing alone, or jointly, without the CDC,

18   constituted a taking which your clients are pursuing.

19   Now, putting aside the ratification issue, too.

20          MR. MAGID:  Yeah.  My understanding is that the

21   CARES Act referred to government payments for housing.

22          THE COURT:  Section 108 housing?

23          MR. MAGID:  Yeah, Section 108.  To my knowledge,

24   none of the apartment units that we are -- that are the

25   subject of our claim are Section 108 properties.

The National Apartment Association, et al. v. USA                    4/19/2022

1          THE COURT:  And what about the 30-day extension

2     in December of 2020?  I guess it would be the extension

3     occurred or Congress passed it in December of 2020, and

4     it took effect for the month of January of 2021.

5          MR. MAGID:  Right.

6          THE COURT:  Standing alone, putting aside the CDC

7     and the issue of ratification.

8          MR. MAGID:  The question is is that a taking as

9     well?

10         THE COURT:  Are you asserting that that, standing

11    alone, constituted a taking such that any of your

12    clients could recover on that issue?

13         MR. MAGID:  That's an interesting question.  To

14    be honest, Your Honor, I haven't gone into the level of

15    detail to know if there are -- if any of our clients

16    would not have been impacted by the CDC order but would

17    have been impacted only by the extension.  My

18    understanding is that in large measure they're impacted

19    by both.

20         THE COURT:  Okay.  Because what I am getting at

21    is if the government ultimately prevails that there is

22    no authority for the CDC to act and no Congressional

23    ratification, is anything left?

24         MR. MAGID:  Yeah, I think it would be, but to be

25    straightforward, at this point, I haven't parsed it out

The National Apartment Association, et al. v. USA                    4/19/2022

1    to, you know, go unit by unit to determine what the

2    effect of just that month's extension would be.

3    Obviously the damages would be less.

4         THE COURT:  Okay.  But it is your position that

5    conceptually, a 30-day moratorium issued by Congress

6    could in and of itself effect a taking?

7         MR. MAGID:  Absolutely.  Absolutely.  In fact, in

8    Cedar Point, the court made this, at page 2074 of the

9    Supreme Court Reporter, the Court said, "A physical

10   appropriation is a taking whether it is permanent or

11   temporary.  The duration of an appropriation, just like

12   the size of an appropriation, bears only on the amount

13   of compensation."

14        THE COURT:  To that point, if I could hear you on

15   the issue of ratification and whether or not Congress

16   ratified the CDC's prior or enduring authority.

17        MR. MAGID:  I told you I was going to defer all

18   of the really interesting things to Mr. Larsen-Bright.

19        THE COURT:  I stand corrected.  I will defer to

20   you on which topic you would like to address next.

21        MR. MAGID:  So if I could just for a moment talk

22   a little bit about Yee.  You know, Your Honor, I think,

23   hit the nail on the head on several fronts.  Yee made a

24   big point of saying that the ordinance there in question

25   did not prevent eviction for nonpayment of rent.  And it

The National Apartment Association, et al. v. USA

1    went on to say, "a different case would be presented

2    where the statute on its face is applied to compel a

3    land owner over objection to rent his property or to

4    refrain in perpetuity from terminating a tenancy."

5            I mean, the court in Yee expressly said the case

6    we have here is not what they're talking about in Yee.

7    Yee -- and Your Honor also raised another important

8    point.  Yee is not just an issue of rent control, but

9    the particular theory on which the plaintiff in Yee was

10   proceeding was really one having to do not with rents as

11   in the rental sense or payment of apartment rent, but

12   what an economist would call rent.

13           That is, as Your Honor pointed out, the real

14   argument there was, has there been a transfer of wealth

15   from the park owner to the unit owner by virtue of the

16   fact that the combination of the statute and the local

17   ordinance meant, in essence, that the owner of the

18   mobile home could sell it to someone, you know, without

19   objection of the property owner, except for unlawful

20   activity or inability to pay rent or whatever, at this

21   lower rent-controlled rate, thereby increasing the sale

22   value of the mobile home.  And the park owner in Yee

23   said, well, we really should be getting that sale value,

24   not you.

25           It is a very different thing from what we're

1    talking about here.  Nothing in Yee was addressing the

2    situation where -- in contrast to Cedar Point Nursery

3    where you could -- you know, whether you were violating

4    the right to exclude, there was no discussion of the

5    right to exclude in Yee.

6         The government, as is the case with a number of

7    courts around the country, did say, well, the big point

8    in Yee is that the property owners were invitees, as

9    that made some kind of distinction.  As I mentioned

10   earlier, and I don't want to belabor the point, but we

11   do not have invitees.  We have former invitees, people

12   who were invited to be on the premises --

13        THE COURT:  At some point they become squatters.

14        MR. MAGID:  They do become squatters, and I

15   didn't want to say that in the pejorative sense and I

16   don't mean it in the pejorative sense, but the Court is

17   exactly right, and there is nothing in Cedar Point

18   Nursery that would suggest, for example, that the result

19   in that case would be any different if at one point in

20   the past the nursery had had union organizers on the

21   premise for an hour or two hours or three hours, as

22   invitees, and then said, okay, we're done with this.

23   And then they come back a couple of years later pursuant

24   to a state statute and say we want to be here for three

25   hours a day, four months of the year, 30 days of those

The National Apartment Association, et al. v. USA                                    4/19/2022

1    months.  Nothing would change.  You can be a former

2    invitee, but you are not a current invitee.

3            So the Yee court, in addition to pointing out

4    explicitly that there was no issue of terminating

5    tenancies for nonpayment of rent and expressly in its

6    language saying a different situation would take place

7    had there been a statute precluding the park owner from

8    removing the mobile home owners for payment of rent

9    makes that case totally distinguishable.  Cedar Point

10   Nursery is on point and the Alabama Association of

11   Realtors case brings us on its face explicitly saying

12   that this statute impinges on the right to exclude.

13           THE COURT:  So let me ask you this:  At certain

14   points in your brief you criticize the government for

15   citing the Supreme Court order as precedent and as

16   dealing with the merits with regard to the authority

17   issue and then in the back half of your brief you are

18   citing the same Supreme Court order for purpose of the

19   illegal exaction and the government's taking.  So which

20   is it?  I mean, is it binding precedent, is it not?  Is

21   it a ruling on the merits, is it not?

22           MR. MAGID:  Yeah.  The Supreme Court order in

23   terms of lifting the stay merely said if the issue -- if

24   we were to decide the issue, it is doubtful that we

25   would come out in the government's favor.  That is not

1  any kind of binding --

2        THE COURT:  Well, if they had disagreed with the

3  District Court's decision, and I thought that they took

4  great pen to say that the District Court opinion was

5  thorough and thoughtful and gave the analysis, almost as

6  if the Supreme Court said we have nothing else to say

7  other than the District Court was correct.

8        MR. MAGID:  You're right, Your Honor.

9        THE COURT:  Because if the District Court were

10  wrong, I can't imagine that they would have allowed the

11  case to continue that way.

12        MR. MAGID:  Right, but I think in exercising

13  their restraint, the real case before them was, you

14  know, should there be a stay.  And so the court said, we

15  see no reason for a stay to be in place, that the

16  underlying issue was, in fact, not before the court and

17  the court merely said, you know, yes, it gave a very,

18  very strong view of what its outcome would be, and Your

19  Honor is exactly correct.

20        I mean, it didn't leave a whole lot of ambiguity,

21  but as a technical matter, it was not a ruling on the

22  merits, it was a ruling on whether there was a reason

23  for the stay to be in place.

24        THE COURT:  Well, I think the Department of

25  Justice would disagree with your statement that it's not

The National Apartment Association, et al. v. USA                                        4/19/2022

```
 1    a ruling on the merits in that they would not have stood

 2    down and allowed the thing to expire but for the fact

 3    that they understood the Supreme Court's message loud

 4    and clear.

 5         MR. MAGID:  Right, but I think litigants at all

 6    times can read the writing on the wall and say, well, do

 7    we really want to have a club pounding over it.  I mean,

 8    it doesn't have to be government litigation, but there

 9    are times when you're getting a clear signal from the

10    court and you cut your losses.  I understand that.

11         THE COURT:  All right.

12         MR. MAGID:  All right.  I want to talk about one

13    other thing just to bring to the Court's attention and

14    it was very much appreciated that Mr. Yale brought the

15    8th Circuit opinion to the Court's attention.  I would

16    like to bring one other case to the Court's attention.

17    This was decided last week by the Superior Court of

18    California in Los Angeles, Judge Highberger, and I only

19    have an actual copy.  So the case title is GHP

20    Management Corporation Versus County of Los Angeles,

21    21CHCV00595.  I don't have a West Law or Lexus cite.  I

22    would be happy to provide that to the Court if you'd

23    like.

24         And I'm sure the Court would love to hear my

25    mellifluous voice read that, but I will save you the
```

1   opportunity, but the court very clearly comes down and

2   it speaks to the eviction moratoria and it states this

3   is clearly a Cedar Point issue, it is a taking, it is a

4   per se taking, it does impinge on the right to exclude,

5   and Yee is talking about something else.  It is really

6   talking about rent control and is talking about a

7   different type of relationship.  I commend that case to

8   you, Your Honor.

9          THE COURT:  Thank you.

10         MR. MAGID:  The illegal exaction argument,

11  there's just not a whole lot of law out there, Your

12  Honor, and I think both the government and the

13  plaintiffs agree that Aerolineas Argentinas is the key

14  case here.  The interesting thing about the case is we

15  read the same sentence differently, I think.  In that

16  case, the court said that an illegal exaction claim may

17  be maintained "when the plaintiff has paid money over to

18  the government directly or in effect and seeks return of

19  all or part of that sum that was improperly paid,

20  exacted or taken from the claimant in contravention of

21  the Constitution, the statute or regulation."

22         It is too narrow to read that as saying that

23  there has to be a payment to the government.  In fact,

24  Aerolineas Argentinas, as the government concedes, talks

25  about payment to third parties for housing and food and

The National Apartment Association, et al. v. USA                    4/19/2022

1    all the rest.  It makes no difference here that the

2    government, rather than saying we will subsidize these

3    tenants to keep them in their homes, but we're going to

4    basically levy a payment requirement on the land owners

5    to reimburse us for that and round trip it, instead just

6    said, property owners, you can't evict.  It is the same

7    under the language of Aerolineas Argentinas, it is clear

8    that this is in effect payment.

9           THE COURT:  Well, the facts in that case are

10   different in that non-U.S. citizens were flown into the

11   United States, presumably to go through our airports and

12   keep going.

13          MR. MAGID:  Correct.

14          THE COURT:  But stayed and claimed asylum, and

15   INS, under old law --

16          MR. MAGID:  Right.

17          THE COURT:  -- required the airlines, because

18   they're the ones that brought them here without the

19   proper documentation, to house, guard and give them

20   subsistence.  And the statute was thereafter changed to

21   impose it upon the INS to take on that responsibility.

22   And the INS continued to have the airlines bear the

23   brunt of that responsibility, both in cost and I assume

24   accommodations.

25          MR. MAGID:  Right.  It was for the in-transit or

The National Apartment Association, et al. v. USA                    4/19/2022

1    whatever, there was an acronym for the in-transit.

2            THE COURT:  There was a carve-out for two groups

3    and the INS did not carve out.

4            MR. MAGID:  They carved out for the one.  So the

5    asylum seekers, the INS they agreed they had to take

6    care of, but the INS read the 1986 statute, which said

7    that the airlines were responsible for in-transit

8    passengers, and as you know, the court said, yeah, but

9    what that means is if you've got folks that are

10   transferring through a United States airport to go on to

11   another country, you know, you have to make sure that

12   they're in a secure area and not just running around the

13   airport, and said it is very different from saying you

14   have to hold those people and pay for them until we get

15   around to having some kind of hearing.

16           THE COURT:  And that is different.  Now, we may

17   argue as to how many degrees that is different.

18           MR. MAGID:  Right.

19           THE COURT:  But having the INS say, airlines, you

20   must clothe, food and house these folks, at your own

21   expense, versus you can't evict your tenants for a short

22   duration of time.  It's not as if they said, you can no

23   longer collect rent and you are required to house them,

24   or continue housing them, in your apartment buildings or

25   homes.

1          MR. MAGID:  Well, except that that's, in essence,

2     what's happening.  I mean, you're right, there's -- and

3     I'm not going to argue that the facts are the same.  We

4     don't have a case on all fours with what's going on

5     here.  And none of the cases that -- to be honest, that

6     either side have cited is really on all fours, because

7     this is a different case than has been decided.

8          The point is that the controlling case law says

9     it doesn't have to be, and the government agrees with

10    this, a payment directly to the government.

11         THE COURT:  That's correct.

12         MR. MAGID:  And there could be, under the

13    language of Aerolineas Argentinas, it could be a payment

14    in effect, and it can also be -- it also applies to

15    property that was paid, exacted or taken.  So payment is

16    only one of the three means in which an illegal exaction

17    can take place.  And so under the circumstances here,

18    the government has taken the right to collect those

19    rents, to --

20         THE COURT:  Well, it's the enforceability of the

21    lack of paying rent.  It's not that they didn't say you

22    can't collect rent, they simply said you can't evict for

23    failure to pay rent.

24         MR. MAGID:  Right, but as we talked about

25    earlier, the practical effect of that is that money is

The National Apartment Association, et al. v. USA                                    4/19/2022

```
 1    gone.  Yes, you know, those folks are not paying rent,
 2    you can't evict them, you can't replace them with
 3    somebody who can pay rent, and your chances of
 4    collecting rent from those individuals later is gone,
 5    but even if -- you know, even if you could eventually
 6    collect rent from those folks or have some chance at it,
 7    if they're now two months in arrears or whatever and you
 8    say, to Your Honor's point, we have to prove that there
 9    was somebody else, you know, with an application or was
10    interested in renting the apartment, someone else would
11    come in and start paying rent.
12         That is off the table.  That is money that has
13    been paid.  It is no different from an economic
14    perspective than if the government was paying rent for
15    these individuals and then hitting up the apartment
16    owners to reimburse the government for that cost.
17    Instead of doing it that way, it simply said, you know,
18    you can't evict these folks and effecting the same
19    thing.
20         THE COURT:  And the hypothetical I threw at
21    Mr. Yale earlier involving if, in fact, the DOJ or the
22    CDC imposed some sort of fine on one of your clients for
23    evicting someone, despite meeting the requirements of
24    the CDC moratorium, wouldn't that be a better example of
25    an illegal exaction if it was ultimately ruled that they
```

The National Apartment Association, et al. v. USA

```
 1   were authorized or they were not authorized, it was an
 2   illegal act, and therefore they should not have taken
 3   it, and they effectively took -- they now have money in
 4   their pockets, which is a quote in the Aerolineas case,
 5   that belongs to you.
 6            MR. MAGID:  Sure, that's the easy case that we do
 7   have cases that are on all fours.  So, yeah, if they
 8   said we're going to impose this fine for you or
 9   whatever, we've got $100,000 or whatever of your money,
10   that's easy.
11            My point is, there's nothing that says that this
12   case is not the logical extension or this case is not an
13   illegal exaction, and again, I want to broaden it out
14   before I turn it over to the star of our show,
15   Mr. Larsen-Bright, but the overall view here is that the
16   government takes the view that it can effect a public
17   purpose.
18            You know, we're not arguing about the legitimacy
19   or the rationale or the seriousness of the public health
20   emergency.  Covid 19 is a terrible thing and it has
21   wreaked incredible harm, but that is -- you know, this
22   was something carried out for a public purpose, but on
23   the shoulders of private property owners.  That is
24   not -- and the government says, well, it's, you know,
25   not a taking, because it wasn't truly authorized.  We
```

The National Apartment Association, et al. v. USA                          4/19/2022

1    disagree with that for the reasons you're going to hear

2    in a moment, and I hinted to that, and then the

3    government says, by the way, if it wasn't authorized,

4    you still don't get anything, because this was not a

5    direct payment to the government.  And that just simply

6    is not a tenable position, Your Honor.

7              THE COURT:  Thank you, counsel.

8              MR. MAGID:  Thank you for your time, Your Honor,

9    I am going to turn it over to Mr. Larsen-Bright.

10             MR. LARSEN-BRIGHT:  Good morning, Your Honor,

11   Shawn Larsen-Bright, Dorsey, here on behalf of the

12   plaintiffs.  I appreciate the opportunity to address the

13   Court.  Mr. Magid already addressed some of the issues

14   and I'm here to address the remaining issues and some of

15   the questions that the Court had.

16             I want to start with the issue of the authority

17   argument, and I know the Court had a number of questions

18   posed to counsel about that and I want to address those,

19   but I think before we get to them, I want to talk about

20   the legal framework that we're operating under here,

21   because I think the government's brief is dead wrong on

22   the framework that we should be operating under here,

23   and I -- and I think that presentation from the

24   government this morning was also inaccurate.

25             So I want to start there.  And this is partly

The National Apartment Association, et al. v. USA

 1    explained in Del Rio and some other cases as well, but
 2    the issue here is that the concept of authorization has
 3    different meanings and different contexts.  It has one
 4    meaning in the context of a challenge to the legality of
 5    a government action, where it effectively means
 6    unlawful, and it has a very different meaning in the
 7    context of a takings claim, where the word "authorized"
 8    is essentially a term of art.
 9         It's used as a conceptual way of distinguishing
10    an act that is chargeable to the government that could
11    generate a takings claim, versus an act that is ultra
12    vires and therefore not chargeable to the government at
13    all.
14         And the government here, their argument conflates
15    those two different meanings, but we have to keep them
16    separate.  We know we have to keep them separate because
17    that's exactly what the Federal Circuit explained in the
18    Del Rio case.  So in Del Rio, the Federal Circuit said,
19    and I'm going to quote, because it's important, "The
20    question about authorization in the takings context is
21    really asking whether the alleged invasion of property
22    rights is chargeable to the government or is an act
23    committed by a government agent acting ultra vires."
24         And then it went on to say, "To assess whether
25    the conduct is ultra vires, the Court must consider

1    whether the conduct was either explicitly prohibited, or

2    was outside the normal scope of the government

3    official's duties."

4         In other words, for an action to be authorized

5    for takings purposes only, it's authorized if it fell

6    within the general scope of the official's duties and

7    was not prohibited by Congress.  It does not mean --

8         THE COURT:  Well, I don't think the court went so

9    far as to say it must be expressly prohibited by

10   Congress.

11        MR. LARSEN-BRIGHT:  It says, and I'm quoting,

12   Your Honor, "The conduct was either explicitly

13   prohibited or was outside the normal scope of the

14   government official's duties."  That's at page 1363.

15        THE COURT:  Right, you said "or."

16        MR. LARSEN-BRIGHT:  Exactly.

17        THE COURT:  It could be either or, not both.  So

18   your original argument was it had to be both.  And I

19   understood you originally saying that it's outside the

20   scope and Congress didn't authorize it.

21        MR. LARSEN-BRIGHT:  No, that's not what I'm

22   saying, Your Honor, I apologize if I misspoke.  It's

23   within the scope of the duties, the normal scope of the

24   government agent's duties.

25        THE COURT:  Right, and in this case, with the CDC

The National Apartment Association, et al. v. USA                                      4/19/2022

```
 1    and the Covid pandemic, we are dealing with
 2    unprecedented time and I don't know if the Supreme Court
 3    called it breathtaking or a word that was analogous or
 4    similar to that, that the action taken was so far out of
 5    the realm of normalcy of what the CDC had been doing
 6    since the statute was enacted in the 1940s, that I don't
 7    know that we can cabin the eviction moratorium as
 8    engaged in the normal course of its duties.
 9              MR. LARSEN-BRIGHT:  Okay, but that is the exact
10    issue we're here to talk about, right?  It's not that
11    the Supreme Court in its opinion said "it's virtually
12    certain," that's the language the government repeatedly
13    uses, "virtually certain that the CDC action here was
14    unlawful."  That doesn't resolve the issue, because the
15    real issue is whether this action was -- could be
16    considered within the general scope of the CDC's duties.
17              And the government says repeatedly, well, there
18    was no Congressional authority for this action.  No
19    Congressional authority.  But, of course, there was
20    Congressional authority for the CDC's -- for what the
21    CDC was doing in the general scope of its duties.  There
22    is the Public Service Health Act, which provides very
23    broad authorization and authority to HHS and the CDC.
24              It says there is authority to make and enforce
25    such regulations as in his judgment, being the
```

The National Apartment Association, et al. v. USA

1    secretary, as are necessary to prevent the introduction,

2    transmission, spread of diseases.  In other words, it's

3    a very expansive type of discretion and authority.

4         THE COURT:  But with limits.  So under your

5    reading, or your statement of what the authority is, the

6    CDC could have just shut down air space and said, no

7    more planes in and out of this country because we don't

8    want Covid 19 coming to our shores.  That cannot be

9    Congress's intent in the statute.

10        And I think that the other courts, save one, have

11   come to the right conclusion in that the second sentence

12   of 42 U.S.C. 264(a) cabins in the first.  The first

13   gives the CDC director, or the secretary of the HHS, and

14   thereafter through delegation, the authority to act, and

15   then Congress says, and here are the kinds of things

16   that you should be doing, but this is not an exhaustive

17   list.

18        So things like this is what you can do, which is

19   why I said at the beginning, based upon my review of

20   that alone, and to be fair, I stood before the Federal

21   Circuit for the better part of a decade arguing for

22   judicial deference and I would not get to Chevron based

23   upon the language of this statute because it is clear to

24   me that under no reading of this language does Congress

25   give the authority to the CDC director to enact what the

The National Apartment Association, et al. v. USA

1    Supreme Court called unprecedented expansion of

2    authority under this statute.

3         Where I was hoping to go was whether or not

4    Congress either ratified or the Congressional act in and

5    of itself, or Congressional acts in and of themselves

6    constitute a taking.

7         Again, I'm not asking you to waive the argument

8    that I'm reading the statute wrong and that the D.C.

9    District Court got it wrong and the Supreme Court should

10   not have affirmed or vacated the stay, and that's an

11   issue that you can take up on appeal, depending on how

12   this goes, but I am curious as to whether or not this

13   other Congressional act does something that the statute

14   does not in my opinion.

15        MR. LARSEN-BRIGHT:  So I just want to address

16   this one more time on the legal framework, because I

17   think the distinction that I'm trying to draw, Your

18   Honor, is that even if you believe that those courts

19   that found that the CDC should not have issued the

20   eviction moratorium because it went beyond what is an

21   appropriate interpretation of the statutory authority,

22   even if you find that, that does not resolve the

23   question of authority for takings purposes, because it's

24   a different analysis.

25        The question of whether the action was unlawful,

The National Apartment Association, et al. v. USA

1    illegal, the agency misinterpreted or misapplied its
2    authority, that's not really the question.  The question
3    is, can we determine whether what the agency was doing
4    was within the general scope of its duties, and here's
5    why I think the answer to that question is yes, because
6    there was broad authority, maybe it overstepped its --
7    the legal constrictions of its authority, but there was
8    broad authority.
9          And we have here the moratorium being issued by
10   the agency that is charged with addressing communicable
11   diseases.  It's focused on trying to stop the spread of
12   communicable diseases.  It's at the direction of the
13   President, which is telling the agency to consider
14   action just like this to stop the spread of the disease.
15   It's extended by Congress, it's championed by two
16   presidential administrations.
17         It is difficult to imagine that that kind of
18   action should be considered ultra vires, not chargeable
19   to the government at all.  Treated as if it didn't
20   happen from the government.  And that's really the
21   distinction I'm trying to draw.  It ultimately does not
22   matter under Del Rio and the right framework for takings
23   claims.  It doesn't matter if the CDC got it wrong.
24         THE COURT:  Well, the Del Rio court said that the
25   agent had the authority to do what they did, they just

The National Apartment Association, et al. v. USA                      4/19/2022

1    didn't exercise that authority appropriately.  Here, the

2    courts have found that the CDC did not have the

3    authority to do what it did, let alone let them exercise

4    it.

5         MR. LARSEN-BRIGHT:  But I think that's conflating

6    really the two meanings of authority that we're talking

7    about, because in Del Rio, what the court said is that

8    the agency had the authority to regulate in this general

9    scope.  In other words, it had the authority to issue

10   mining permits and regulate mining, et cetera.

11        Well, here the CDC has the authority to regulate

12   in this general scope.  Their charge is to issue

13   regulations to prevent the spread of disease.  That's

14   what they did.  That was within the normal scope of what

15   they understood their charge to be.

16        THE COURT:  But in combatting the disease itself.

17        MR. LARSEN-BRIGHT:  Well, yes.  I mean, the

18   agency, the Presidency and Congress in extending it all

19   believed that this was within the general scope of

20   duties, and then we have decisions later that find,

21   actually, you overstepped your bounds.  But what I'm

22   suggesting to the Court is that that ultimate

23   conclusion, even if you accept that, does not change the

24   analysis for takings purposes.

25        I know the Court has asked a couple of questions

The National Apartment Association, et al. v. USA                    4/19/2022

 1    about Congress's action and ratification.  We are not
 2    asserting in this case that the President's executive
 3    order that directed the agency to take action was itself
 4    a taking; however, that is part of the mix that goes
 5    into whether the CDC was acting within its overall
 6    authority.  We're also not taking the position in this
 7    case that the original CARES Act moratorium that
 8    affected federal properties was a taking, as Mr. Magid
 9    said.
10          The plaintiffs that we have in this case did not
11    have those type of properties, but the extension of the
12    moratorium is incredibly important for this analysis.
13    Both for the fact that even if the government is right
14    in all respects of its arguments, and we don't think it
15    is, but even if it was, we do have a month-long period
16    where Congress expressly authorized this taking to
17    occur, but I think the more -- and so I think setting
18    everything else aside we have a claim for a taking for
19    that period.
20          But I think the more important point is that that
21    action by Congress confirmed that if you look at the
22    structure of Del Rio, there wasn't any express
23    prohibition on this action, and to the contrary, this is
24    Congress acknowledging the CDC's exercise of authority.
25          We think it could be considered ratification.

The National Apartment Association, et al. v. USA

```
 1    The government says those arguments were made at the
 2    Supreme Court.  Well, they weren't resolved by the
 3    Supreme Court.  The only issue in front of the Supreme
 4    Court was whether to continue the stay.  Technically
 5    that's the only issue that was before the court.
 6          THE COURT:  But other than the -- we're going to
 7    extend what they did, Congress, talking about the CDC,
 8    there's nothing in the language of the Congressional act
 9    that said, CDC got it right, they're duly authorized to
10    do this, we see theirs is expiring, in case they don't
11    re-up it, which they're allowed to do, we're going to do
12    that for them.
13          I think it was the Northern District of Ohio who
14    said it best that Congress was just trying to bridge the
15    two different administrations by giving both the
16    opportunity to act as they saw fit.
17          MR. LARSEN-BRIGHT:  But the thing that you could
18    not possibly take from that is that Congress is
19    objecting to the CDC's exercise of authority.  I mean,
20    the extension language specifically identifies the
21    Public Service Health Act.  It says, you know, the
22    eviction moratorium issued by the CDC pursuant to
23    Section 364 is hereby extended.
24          So if we're looking at whether the authorization
25    prohibits -- issued prohibits a takings claim, I think
```

The National Apartment Association, et al. v. USA                    4/19/2022

1    it's important to say, even if there wasn't

2    ratification, per se, actual ratification, there is at

3    least an acknowledgment by the -- by Congress that the

4    CDC was acting within the general scope of its duties

5    because it was operating under statute, passed by

6    Congress, that Congress is acknowledging was applied by

7    the CDC to get there.

8         THE COURT:  And I guess the question is, then, is

9    an acknowledgment that this happened enough, or was it

10   also an endorsement of what happened?  Because clearly,

11   I agree with you, it is not a you shouldn't have done

12   it, we have to do it, and we're going to do it.

13        MR. LARSEN-BRIGHT:  And I think, then, not to

14   repeat myself, but then you go back to looking at what

15   the legal framework is, and the legal framework for

16   whether a takings claim is prohibited for some conduct

17   that's alleged to be unauthorized, is whether it's

18   outside the general scope of the duties.  And when

19   Congress is saying the CDC acted pursuant to its

20   statutory authority, that is strong indication of

21   Congress recognizing that the CDC was acting within the

22   normal scope of its duties, even if it ultimately got it

23   wrong, its action was within the normal scope of what we

24   expect the CDC to do, which is act under this statute to

25   take action to combat disease.  I hope I have answered

The National Apartment Association, et al. v. USA                                4/19/2022

1    the Court's question on the authorization issue, but

2    does the Court have any others?

3           THE COURT:  I have a process question, which

4    is -- or a procedural question of how you would like to

5    address -- and it doesn't have to be on the spot now, of

6    this new -- and obviously the government would like to

7    -- the government will be afforded the opportunity to

8    address it as well, the standing alone Appropriations

9    Bill and whether or not that, in fact, constituted a

10   taking.

11          MR. LARSEN-BRIGHT:  Well, I'll just add one

12   comment on that, Your Honor, which is, you know, in the

13   government's opening brief, they said, well, you know,

14   you didn't specifically allege in the complaint that

15   that in and of itself was a taking.  I think in our

16   view, that is encompassed by our complaint.  It's

17   referenced in the complaint.  Of course, the focus of

18   the action was against the CDC order, which included the

19   original order, the extension by Congress, and each

20   subsequent extension as well so that the extension is

21   one of the pieces of the order that we've asserted in

22   our complaint.  We think it is in there already.  If the

23   Court believes that it's not adequately pled, that's

24   something that could be addressed, but we certainly

25   always intended that that would be part of -- part of

The National Apartment Association, et al. v. USA

 1    our takings claim.

 2         THE COURT:  But my question is, you are not

 3    clearly asserting that the stand-alone piece, and so if

 4    the Court were to rule that CDC lacked the authority to

 5    issue the executive -- the moratorium, the eviction

 6    moratorium, and Congress did not ratify the action,

 7    you're only left with the original CARES Act, which you

 8    have effectively conceded does not apply to the

 9    plaintiffs in this case, and the 30-day extension where

10    Congress acted and took the same eviction moratorium and

11    put it in place for that 30 days or 31 days.

12         And I don't know whether or not anyone on -- any

13    one of your clients has standing or wants to litigate

14    that issue, if there's nothing else left.  But what I

15    don't want to do is decide this case as I think one of

16    the legal issues we have to address is whether taking

17    all the pieces, the sum is greater than the parts.  But

18    in doing that, I can't ignore the part where there is no

19    authority issue, because Congress acted, and it

20    potentially impacted your clients.  But I don't know

21    that a 30-day moratorium rises to the level of a taking

22    in theory or in practice in this particular case.

23         And so I can't leave that and say, because that's

24    the quickest way to rule on this, and/or -- and maybe go

25    through damages issues, or certify it for interlocutory

The National Apartment Association, et al. v. USA

 1    appeal, and have the Federal Circuit say, well, why

 2    didn't you consider this piece?  And that's what I'm

 3    trying to flesh out and whether it makes sense to have

 4    supplemental briefing on that issue or not, if you want

 5    to pursue it.  But I will not ask the government to

 6    brief the issue if you are not going to pursue that

 7    piece.

 8            MR. LARSEN-BRIGHT:  I appreciate that, Your

 9    Honor, and I'm pausing to think.

10            THE COURT:  Well, why don't we do this.  We can

11    move on to any other arguments you want to make and then

12    I'll hear back from the government, give everyone time

13    to discuss -- we can talk about how we want to proceed,

14    whether there are any other issues that merit additional

15    briefing, whether you should just send us the cites that

16    you've both referenced, or it makes sense to file a

17    notice of supplementary authority.

18            I don't want to create homework.  My concern is

19    just getting the cases so that we can make an

20    appropriate decision based upon all the law that the

21    parties want to raise.  So --

22            MR. LARSEN-BRIGHT:  Understood.  Well, the other

23    two items that I was prepared to address, if the Court

24    has questions about them, are the sort of inhering

25    property interest issue, I can address that briefly, as

The National Apartment Association, et al. v. USA                                4/19/2022

```
 1    well as the police power argument.
 2          THE COURT:  I may cut to the chase on this one
 3    for you, is I don't believe and I still don't believe
 4    that the CDC had the authority, standing alone, to act;
 5    therefore, I can't imagine how they would have the
 6    authority to regulate pre-eviction moratorium, and that
 7    that somehow was inhered to your client's property
 8    rights from the CDC's perspective.
 9          Now, if we're going down the road of a
10    Congressional act standing alone or a Congressional
11    ratification of the act, there may be an inhering
12    argument and/or a police power argument.
13          MR. LARSEN-BRIGHT:  Thank you for that
14    clarification.  Maybe I'll just address a few of the
15    points, then.  So starting on the property interest, you
16    know, so the question here is whether there's a
17    compensable property interest.  That's really the
18    question that we're asking.  The CDC order came
19    subsequent to the property owners' interest.  We don't
20    think there's really any way that the CDC order itself,
21    the eviction moratorium itself, could be seen as somehow
22    inhering or preventing the property owners' interests,
23    right to evict, et cetera.
24          And so the question really is, does the -- does
25    the Public Service Health Act from the 1940s that gives
```

The National Apartment Association, et al. v. USA

1    the CDC general authority to act, was that in and of
2    itself some kind of restriction on property owners'
3    rights.  And to that end, I think it's kind of an
4    extraordinary position for the government to take.  What
5    they're essentially saying is that this act from the
6    1940s means that all property owners nationwide are
7    prohibited from ever asserting a takings claim based on
8    what the CDC does if it follows this statutory
9    enactment.
10          That is vastly broader than any of the property
11    rights cases that they have cited.
12          THE COURT:  Although I think the government would
13    argue, if this Court finds that there was authority,
14    based upon the original statute, for the CDC to issue
15    this eviction moratorium, then by right and definition,
16    the CDC had the authority to prescribe these types of
17    things dating back to the 1940s.  Since it is the
18    government's position that the authority does not -- did
19    not exist and does not exist, you can't inbed those
20    rights for something that didn't exist.
21          MR. LARSEN-BRIGHT:  Well, if you take a step back
22    and think about the government's position, it's kind of
23    extraordinary.  If the government didn't have authority
24    to do what it did, you can't assert a takings claim.  If
25    the government did have authority to do what it did, you

The National Apartment Association, et al. v. USA

 1    can't assert a takings claim.  Regardless, the
 2    government wins.  Well, that's not the law.  The law
 3    is --
 4         THE COURT:  Well, if the government were
 5    authorized to take this action, then you could
 6    conceivably have a takings case.
 7         MR. LARSEN-BRIGHT:  But the government says we
 8    can't.  The government says if the CDC was authorized to
 9    take this action, well then the action inhered
10    everybody's property rights, all property owners
11    nationwide did not have the right to evict people if the
12    CDC said they didn't.  And so you can't assert a takings
13    claim.  It's, you know, heads the government wins, tails
14    the government wins.
15         Well, that's -- you know, it's silly, because
16    that's no what the law is.  This whole concept of
17    inhering and property rights is a very narrow concept
18    that's discussed in Cedar Point and Lucas, and it's
19    about traditional common law privileges and
20    long-standing restrictions on title.  There's nothing
21    about that here, Your Honor.
22         Very briefly, too, on the police power argument,
23    because it sounds like that's not a focus of the Court,
24    but I do want to address it because the government
25    argues that, again, sort of setting aside everything

The National Apartment Association, et al. v. USA                              4/19/2022

1  else, this should be just considered an exercise of
2  police power that could never generate a takings claim
3  to begin with.
4        The police power cases -- the police power
5  concept is a very narrow limitation on takings
6  jurisdiction that is focused entirely on temporary
7  seizures by the government to enforce criminal law or
8  support law enforcement.  All the cases they cite are
9  about that.  All the cases that are out there are about
10 that.  They don't cite a single case in any other
11 context because they can't.
12        There's an extended discussion in the briefing
13 about the Block v. Hirsch case, which is 100-year-old
14 rent control case.  I won't get into all the details,
15 they're in the brief, but I just want to highlight that
16 the government cites that case because it uses language
17 about police power, but the language in the case was not
18 saying that there's some police power exception to the
19 normal takings juris prudence.
20        All the court was doing in that case was
21 distinguishing, in language of the time, which is not
22 the language we would use today, between eminent domain
23 and other types of regulatory acts by the government.
24 There's nothing in that case that supports their
25 argument here that what the CDC did should be -- should

The National Apartment Association, et al. v. USA                                          4/19/2022

 1    fit within this narrow police power exception.

 2         THE COURT:  And what about Congressional police

 3    power?  If we're talking about that one month that

 4    Congress imposed the CDC's eviction moratorium

 5    extension, does Congress have the necessary police power

 6    to thwart any taking claims?

 7         MR. LARSEN-BRIGHT:  No, Your Honor.  And the case

 8    law about the police power exception, if you want to

 9    call it that, is very clear about the types of things

10    that it applies to.  It applies to -- I mean, in the

11    cases they cite, it's a government seizure of goods to

12    support a criminal prosecution, it's the government

13    seizure of counterfeit goods at the border, it's

14    government seizure of a laptop to support a customs

15    investigation.

16         None of that has anything to do with what we're

17    talking about here.  This is not a -- this was not an

18    act to support the criminal law and if you look at Cedar

19    Point, Cedar Point talks about related concepts, all

20    within the notion of whether there's really a property

21    interest.  It doesn't use the words "police power," or

22    phrase "police power," but it talks about whether

23    there's a compensable property interest, and it says

24    things like, you know, you don't have a property

25    interest in committing nuisance, you know, the

The National Apartment Association, et al. v. USA

 1    government stopped you from being a nuisance, you can't

 2    assert a takings claim because you never had a right to

 3    do that to begin with.  And that there's traditional

 4    common law privileges around entry into your house for

 5    criminal law purposes.  These types of seizures,

 6    temporary seizures for criminal law purposes.  There's

 7    nothing about any of that body of law that would suggest

 8    that Congress could act in this way and it would be

 9    considered just an exercise of police power that's not a

10    taking.

11         THE COURT:  Well, what about the Congressional

12    appropriation of $50 billion for potential rental

13    assistance, payable to either the tenant or the landlord

14    for nonpayment of rent?  How is Congress taking if

15    they're also paying?

16         MR. LARSEN-BRIGHT:  Well, they're two separate

17    components, Your Honor.  I mean, there is -- suppose the

18    Congress, to give a more simplistic example, suppose

19    Congress takes over a plot of land that's worth $100

20    million and it pays $50 million for it.  You still have

21    a takings claim for the rest of the value, and that's

22    the same -- it would be the same -- conceptually the

23    same here.

24         You know, the argument about whether -- and this

25    was raised earlier -- whether the plaintiffs here got

The National Apartment Association, et al. v. USA

```
 1    any of that $50 million or what actual damages they have
 2    because of when other tenants could have moved in and
 3    how much rent was lost, those are all damages questions.
 4    You know, that's for another stage of this proceeding,
 5    and it's the same with the rental assistance authorized
 6    by Congress.  If one of the plaintiffs had taken that
 7    money and didn't actually have any damages as a result,
 8    well then it's got no damages, even if it has a takings
 9    claim.
10             THE COURT:  Thank you, counsel.
11             MR. LARSEN-BRIGHT:  All right.  Thank you, Your
12    Honor.
13             THE COURT:  Mr. Yale?
14             MR. YALE:  I just had I guess a few followup
15    points.  So first on the citation to Loretto in the
16    Alabama Association of Realtors case, I just want to
17    point out that there was no briefing at the Supreme
18    Court on the takings issues.  I mean, the taking --
19    there were takings claims below, but there was no
20    briefing at the Supreme Court on the takings issue.
21             The citation to Loretto from the irreparable harm
22    section is -- I think plaintiffs are making way too much
23    of that citation, and if anything, if there was actually
24    available a just compensation remedy for a takings
25    claim, then there would be no necessity to actually
```

The National Apartment Association, et al. v. USA

1    enter an injunction and for the Supreme Court to accept

2    that injunction essentially, if that was the case.

3           THE COURT:  Well, wasn't that Youngstown Steel

4    where if there's a remedy, you can't enjoin the action

5    and the Supreme Court said, no, no, no, they can't act

6    unlawfully and just pay for it, you have to act lawfully

7    and then you might be liable to pay for it.

8           MR. YALE:  Well, I think you're talking about

9    Youngstown Sheet and Tube?

10          THE COURT:  Yes.

11          MR. YALE:  I think THAT what they are saying in

12    Youngstown was essentially here's what you have to do in

13    terms of you need essentially express authority from

14    Congress, but the government there was arguing, well,

15    they can bring a takings remedy and receive compensation

16    there, and what the Supreme Court was saying was no,

17    like you can't do that because they were citing to the

18    Hooe case, where there actually was no just compensation

19    remedy there.

20          And so if what the Supreme Court was really

21    saying in Alabama Association of Realtors was, oh, no,

22    there's -- we're citing to Loretto because you have a

23    takings remedy, then that irreparable harm section

24    actually makes no sense.

25          There's just a couple of other cleanup points I

 1    wanted to make.  You mentioned, and I think this was a
 2    question you asked me and I didn't fully respond to it
 3    when I was up here initially, but with respect to Yee
 4    and that there was, you know, the difference between
 5    state regulation and federal regulation, I mean,
 6    obviously the states have a much broader police power,
 7    but the Federal Government still has the ability to
 8    regulate housing.  I mean, there's plenty of laws, and
 9    when we're talking about fair housing laws,
10    anti-discrimination laws and the like.
11          And so sort of the suggestion that the Federal
12    Government can't impose restrictions on eviction, I
13    mean, that's just not true.  It may not be as broad as
14    the states, but in the context of whether or not the
15    Federal Government's power with respect to housing
16    applies with respect to the Yee construct, we certainly
17    think it does.
18          You know, and I think my colleague was also
19    mentioning, he had a statement that there's nothing in
20    Yee to addresses the right to exclude.  I mean, that's
21    just not true.  I mean, there is -- that's the principal
22    argument that was made by the plaintiffs there, that
23    their right to exclude was infringed upon because they
24    were in a situation with a combination of laws, they
25    weren't able to get rid of those particular tenants.

The National Apartment Association, et al. v. USA

1    And based upon, you know, the combination of laws that

2    existed there.  So we think that Yee is on point.

3          One more -- something to point out about the

4    illegal exaction argument.  There is not a single case

5    in the history of the legal exaction juris prudence

6    where there hasn't been a payment made to the government

7    through a third party.  The Piszel case that we cited

8    to, you know, plaintiffs' counsel did not mention

9    Piszel, which has a clear, clear statement that there

10   needs to be a payment.

11         And again, going -- that's just going back to the

12   jurisdiction of this particular court.  And I might add,

13   so this is a case -- I mean, we certainly didn't put

14   this in our briefing, but now that it's brought up,

15   Columbia Regional Hospital was a Federal Circuit case

16   from 2021, it's 990 F.3d 1330, but it explained sort of

17   that the two sort of non-contract avenues for bringing

18   claims in the Court of Federal Claims.

19         And so there's obviously the situation where

20   there has been money paid and that's the illegal

21   exaction situation, so there's money in the government

22   pocket, or in effect, and in effect is when it's been

23   paid to a third party.  So that's the situation --

24   that's one of the two non-contract avenues.

25         The second is where there has not been money

The National Apartment Association, et al. v. USA                    4/19/2022

```
 1   paid, and that's where there needs to be a

 2   money-mandating statute.  And so this sort of -- this

 3   contention that there can be an illegal exaction where

 4   the plaintiffs are not actually out of the money, it's

 5   not with the government, it's not like a tax refund

 6   suit, it's not in the government's party, and the

 7   government has not required it to be paid to somebody

 8   else.  That's just a straight -- again, it's just going

 9   back to what I said before --

10        THE COURT:  But hasn't the government effectively

11   taken that money by forcing or kind of having the

12   landlords tie one of their enforcement hands behind

13   their back, saying you can't evict these folks?  What

14   other leverage do they have other than knocking on the

15   door saying, do you want to pay today?  Do you want to

16   pay today?

17        MR. YALE:  Essentially what that's talking about

18   is the situation where money has not been paid to the

19   landlords and that's what the Westfed case, that we

20   cited to, and that's what Piszel was talking about.

21   That not receiving money is not the basis of an illegal

22   exaction claim.  No court has ever found that.  That's a

23   drastic expansion of that.

24        And part of the underlying rationale of that

25   would be that's essentially just an -- that's just a
```

The National Apartment Association, et al. v. USA

```
 1    masquerading APA claim claiming damages.  And it
 2    doesn't -- it doesn't and should not fall within this
 3    Court's jurisdiction.
 4            And I think the only other -- I think I mentioned
 5    I have, you know, a copy of this 8th Circuit decision,
 6    so I can hand it to the clerk.
 7            THE COURT:  Why don't you just leave it on
 8    counsel desk when you leave.
 9            MR. YALE:  Sure, I will do that.
10            THE COURT:  Thank you.
11            MR. YALE:  Thank you, Your Honor.
12            THE COURT:  Just one minute.  Counsel, any
13    preliminary thoughts on how you would like to address
14    the Congressional 30-day extension as a standalone
15    taking?
16            MR. MAGID:  Your Honor, I think if we could --
17    well, maybe if we could respond to the Court within say
18    two days or something on whether briefing is -- my
19    inclination is that that needs to be addressed through
20    supplemental briefing, but I probably should consult
21    just to make sure that, you know, that is of everybody's
22    interest.
23            THE COURT:  How about this, I will -- I'm going
24    to issue an order after this hearing noting your
25    withdrawal of the trade association.
```

The National Apartment Association, et al. v. USA                                 4/19/2022

```
 1           MR. MAGID:  Right.
 2           THE COURT:  I will not -- I will also state that
 3    you are not required at this point to file an amended
 4    complaint, because I want to sort through all of
 5    these -- figure out what is left of the claims, and then
 6    if you can add more plaintiffs, if there's any
 7    specificity that's required, if you are going to allege
 8    a 30-day taking, that all can be done rather than
 9    piecemealing and having you file amended complaint after
10    amended complaint and then tolling the government's
11    response.
12           So I'm inclined to -- maybe two days is too short
13    to make that -- well, because I think you also have to
14    consult with your clients and find out if any have
15    standing to bring that.
16           MR. MAGID:  Right.
17           THE COURT:  How about in a week's time, I will
18    ask the parties to file a joint status report asking
19    whether or not or suggesting to the Court a briefing
20    schedule of any supplemental briefing.  At that point --
21    you can sit down.  I'm sorry, counsel.  At that point
22    you can say, no supplemental briefing, we'll stand on
23    our briefs, we would like supplemental briefing if there
24    is, in fact, a request for the plaintiffs that they want
25    to pursue this -- and I don't want it to bootstrap on
```

The National Apartment Association, et al. v. USA                                    4/19/2022

1    the ratification argument, that has been fully briefed.

2    It is solely and simply whether the 30-day extension of

3    the CDC eviction moratorium by Congress in and of itself

4    standing alone as if nothing else had happened

5    constituted a taking and/or an illegal exaction.

6          And so you would go first, because the onus would

7    be on you.  And then the government, you can let me know

8    when you would like to respond.  And I will ask for a

9    reply if I feel I need one, but do not file one unless I

10   ask for it.

11         Are there any other process or procedural issues

12   we need to address today?

13         MR. MAGID:  No, Your Honor.  Thank you very much

14   for your time.

15         THE COURT:  Counsel?

16         MR. YALE:  None from the government, Your Honor.

17   Thank you.

18         THE COURT:  I will issue an order.  I thank the

19   parties again both for the briefing and the oral

20   argument.  I know it went long, but it was very helpful

21   to me, and we stand adjourned.

22         (Whereupon, at 11:06 a.m., the proceedings were

23   adjourned.)

24

25

The National Apartment Association, et al. v. USA                4/19/2022

```
 1                    CERTIFICATION OF TRANSCRIBER

 2

 3          I, Sally Jo Quade, RPR, court-approved

 4   transcriber, certify that the foregoing is a correct

 5   transcript from the official electronic sound recording

 6   of the proceedings in the above-titled matter.

 7

 8

 9

10   DATED:  4/22/2022     s/Sally Jo Quade

11                         Sally Jo Quade, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```